# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-00578-COA

**MISSISSIPPI DEPARTMENT OF WILDLIFE, FISHERIES, AND PARKS**                                        **APPELLANT**

**v.**

**CANDACE WEBB, THOMAS HARPER, AND KATHLEEN D. WEBB**                                        **APPELLEES**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/02/2014 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | STEPHEN GILES PERESICH JOHANNA MALBROUGH MCMULLAN |
| ATTORNEYS FOR APPELLEES: | JOE SAM OWEN ROBERT P. MYERS JR. THOMAS M. MATTHEWS III |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| TRIAL COURT DISPOSITION: | APPELLANT FOUND LIABLE TO APPELLEES; $466,666.77 AWARDED TO CANDACE WEBB; $33,333.33 AWARDED TO KATHLEEN WEBB |
| DISPOSITION: | REVERSED AND RENDERED - 04/18/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLTON, J., FOR THE COURT:**

¶1.     Candace Webb, the legal guardian for minor Shane Webb, and Kathleen Webb, individually and on behalf of the wrongful-death beneficiaries of Christopher Webb (collectively, the Webbs), filed suit against the Mississippi Department of Wildlife, Fisheries, and Parks (MDWFP) under the Mississippi Torts Claim Act (MTCA), claiming that MDWFP

conservation officers acted with reckless disregard for the safety of Shane, Christopher, and other boaters using the Tchoutacabouffa River in Harrison County, Mississippi. *See* Miss. Code Ann. § 11-46-9 (Rev. 2012) (discussing governmental immunity from liability).

¶2. The MDWFP filed a motion to dismiss or, alternatively, for summary judgment, on October 27, 2010, and asserted that exemptions under the MTCA barred the Webbs' claims. On November 5, 2010, the cases were consolidated.[1] Following discovery, the MDWFP filed a supplemental motion to dismiss and/or, alternatively, for summary judgment.

¶3. The circuit court denied summary judgment on July 25, 2012, and the Mississippi Supreme Court subsequently denied the MDWFP's petition for interlocutory review. Following a two-day bench trial on February 18-19, 2014, the circuit court held that the

---

[1] On June 10, 2010, Candace filed suit against MDWFP and Victor Harrington (the owner of the boat operated by Donald Bernius) on Shane's behalf pursuant to the MTCA. Candace charged that MDWFP officers acted with reckless disregard for the safety of Shane and other boaters using the Tchoutacabouffa River. On June 17, 2010, Thomas Harper, as legal guardian of Kailer Harper, a minor, also filed suit against MDWFP under the MTCA. Thomas's suit also charged that MDWFP officers acted with reckless disregard for the safety of Kailer and other boaters using the Tchoutacabouffa River. MDWFP filed a motion to consolidate the two cases on July 15, 2010, pursuant to Mississippi Rule of Civil Procedure 42(a). The Webb and Harper cases were consolidated on September 23, 2010.

On August 19, 2010, Kathleen, individually, and on behalf of the wrongful-death beneficiaries of Christopher, brought suit against MDWFP, Harrington, and Bernius. By order dated November 5, 2010, the circuit court consolidated Kathleen's suit with Candace's and Thomas's cases. Bernius and Harrington were subsequently dismissed with prejudice, and the consolidated cases proceeded against MDWFP.

Four-year-old Kailer was also a passenger in the Webb boat. Although Kailer's guardian, Thomas, initially filed suit on Kailer's behalf, no damages were sought for any alleged injuries to Kailer. As such, discussions in this appeal are directed toward the claims on behalf of Christopher and Shane. Thus, the Appellees are collectively referred to in this opinion as "the Webbs."

2

MDWFP officers acted in reckless disregard for the safety of others when the officers told a boater to move to a safer area after they stopped him, but the suspect suddenly fled and caused a fatal boat collision. The circuit court conducted a hearing on damages on November 5, 2014, and awarded damages to the Webbs.

¶4. The MDWFP now appeals, asserting that the circuit court erred in finding that the MDWFP officers acted with reckless disregard for the safety of others by ordering a suspect to a safer location to conduct a "stop." Finding error, we reverse the judgment of the circuit court and render judgment in the MDWFP's favor.

**FACTS**

¶5. On August 22, 2009, MDWFP conservation officers Barry Delcambre and Michael Thrash witnessed Donald Bernius speeding in a boat on the Tchoutacabouffa River.[2] The officers each navigated their separate patrol boats into the river to investigate and stop Bernius. Bernius saw the officers and came to an initial stop in the middle of the river.

¶6. According to the officers' testimony at trial, they recognized that their boats and Bernius's boat were stopped in a "dangerous area" of the river. The officers testified that this particular area of the river, known as Bend 2, has blind spots where boaters heading from either direction cannot see other boaters approaching from the opposite direction. The officers explained that, as a result of stopping and approaching Bernius, the three boats were

---

[2] *See* Miss. Code Ann. § 59-23-3(e) (Rev. 2013) (defining public waters); Miss. Code Ann. § 51-1-4 (Rev. 2016) (discussing the use of public waterways); Miss. Code Ann. § 1-3-31 (Rev. 2014) (defining navigable waters).

situated in a position so as to occupy most of the width of the river, which, according to the officers, created an eminent hazard for other boaters. As a result, Officer Delcambre instructed Officer Thrash to have Bernius move to the nearby straightaway down the river to provide a safer location for them to question Bernius. Officer Delcambre proceeded ahead of Officer Thrash and Bernius with the intention of blocking oncoming traffic.

¶7. Officer Thrash ordered Bernius to follow them out of Bend 2 into the straightaway, and Bernius agreed to comply with the instructions.[3] Officer Thrash then proceeded to the straightaway after Officer Delcambre so that Bernius could follow him. According to Officer Thrash, Bernius followed him a short distance, and then Bernius abruptly turned his vessel 180 degrees and fled in the opposite direction. Officer Thrash then signaled to Officer Delcambre, and the officers pursued Bernius.

¶8. At the same time, John Joachim was traveling down the river in his boat in the opposite direction from Bernius. Joachim provided in his statement that he observed Bernius speeding and recklessly driving on the wrong side of the river. As Bernius's boat approached, Joachim had to use evasive maneuvers to avoid a collision with Bernius. After passing Joachim's boat, Bernius collided with a boat operated by Christopher. The collision resulted in Christopher's death and injuries to Shane, who was a passenger in Christopher's

---

[3] At trial, Officer Thrash clarified that Bernius responded "OKAY!" and appeared to understand what Officer Thrash had asked him to do. Officer Delcambre testified that he also saw Bernius nod his head affirmatively in agreement. Dexter Bouie, a passenger in Bernius's boat, wrote in his statement given after the accident that Bernius agreed to follow the officers into the straightaway.

boat.

¶9.    Neither Officer Delcambre nor Officer Thrash witnessed the collision.  Once the officers arrived at the scene of the accident, they began rescue procedures, tended to the injured, alerted authorities, and assisted Bernius out of the water. Bernius was treated at Biloxi Regional Medical Center.  Approximately two hours after the accident, a blood sample was drawn from Bernius, which indicated a .25 percent blood-alcohol concentration (BAC) level.[4]  Bernius later pled guilty to boating under the influence (BUI) and causing death and injury.  Bernius is currently serving a twenty-year sentence in prison.  As the record reflects, prior to the incident, Bernius was a paraplegic and wheelchair bound.

¶10.    In connection with the boating accident, the Mississippi Department of Marine Resources (MDMR) investigated Officer Delcambre's and Officer Thrash's conduct.  After interviewing Officer Delcambre and listening to an interview of Bouie, the passenger in Bernius's boat, the MDMR determined that Officers Delcambre and Thrash "acted completely within the scope of their duties . . . ."  The MDMR concluded "that the only people responsible for this boating accident were the people involved in the actual accident." The Webbs subsequently filed suit against the MDWFP under the MTCA, claiming that Officers Delcambre and Thrash acted with reckless disregard for the safety of others when they failed to detain Bernius and instructed him to move to a safer location.

---

[4] *See* Miss. Code Ann. § 59-23-7(1) (Rev. 2013) (stating that the legal BAC for boating is .08 percent).

5

¶11.    At a bench trial held on February 18 and 19, 2014, Officers Delcambre and Thrash testified to their knowledge and understanding of the MDWFP's Standard Operation Procedures (SOPs) for handling BUI situations.  Both officers testified that, in their initial contact with Bernius, his demeanor and handling of his vessel, among other things, failed to indicate he was impaired.  Officer Thrash specifically testified that, at the time, he had no reasonable suspicion to believe Bernius was intoxicated.

¶12.    Officers Delcambre and Thrash testified that their first priority during their initial contact with Bernius was to ensure the safety of other boaters and citizens on the river.  Officer Delcambre explained, "On that particular day[,] due to the river traffic and the fluctuations of the traffic coming north and south up the river where we encountered Bernius there in [B]end [2], due to the nature of where we [were] . . . I made the judgment to move around the bend for the safety of the people and everybody involved on the river."

¶13.    Relying on *City of Jackson v. Brister*, 838 So. 2d 274 (Miss. 2003), the circuit court concluded that the present case involved the officers' failure to detain Bernius rather than their pursuit of him or their failure to arrest him.  The circuit court found that the officers' instructions to Bernius to move toward the straightaway violated Mississippi boating laws and the MDWFP's SOPs.  The circuit court explained that Officers Delcambre and Thrash violated the MDWFP's SOP 04.01, which required the officers to issue boating-related citations "at the scene," and that nothing in the SOP permitted the officers to direct "the offending operator to continue to operate his vessel prior to issuing a citation."  The circuit

6

court thus held the officers' conduct in directing Bernius out of the bend was in reckless disregard for the safety of the public.

¶14.    In making this finding, the circuit court relied on the MDWFP procedures set forth in SOP 07/03 for handling a BUI situation.  SOP 07/03 defines "probable cause" and states that an officer's "effort to establish probable cause for BUI will be after an [o]fficer's stopping of a water craft . . . ."  According to the circuit court, the term "will" is mandatory rather than permissive, such that the officers were not permitted to move or have Bernius move to another location for their "stop."  The circuit court recognized that law-enforcement officers make decisions every day "concerning their safety and others, [and] that they are not to be faulted and do not become liable to those who may be injured simply because sometimes those decisions were not the best decisions in hindsight . . . ."  Nevertheless, the circuit court found the officers' decision to direct Bernius to move his boat was made with a deliberate disregard for the risk such that the officers "were consciously indifferent to the consequences of their actions and inactions."  According to the circuit court, this action constituted a failure to exercise any care, resulting in "wantonness," and not a failure to exercise due care, which would have resulted in negligence.

¶15.    The circuit court further found that the evidence discovered after the accident failed to determine whether Officers Thrash and Delcambre acted in reckless disregard prior to the accident.  However, the circuit court did find that the "after-accident information" did "impact on the credibility of the witnesses and the story told by the officers."  The circuit

court explained the fact that Bernius was ultimately determined to have a .25 percent BAC "does not mean that the officers knew or should have known of that at the time they stopped Bernius. . . . It does, though, call into question the officers' observations (or lack there of) [of] Bernius . . . [and] [i]t raises a question in the court's mind about the accuracy of the officers' observations of Bernius or perhaps the accuracy of their testimony."

¶16.    The circuit court also discussed Joshua Lord's testimony that, after the accident, he heard Officer Delcambre tell other officers that "they stopped Bernius because the [other] passenger was propping Bernius up and that the two men were back to back." The circuit court acknowledged that Officer Delcambre denied making this statement, but the court observed that "[Officer] Delcambre's memory was also questioned concerning the odor of intoxicants on Bernius after the accident." The circuit court explained that Keith Bond's report from the accident "clearly states that Officer Delcambre told Bond at the scene after the accident that he smelled the odor of intoxicants on Bernius's breath upon pulling Bernius from the water following the accident." The circuit court acknowledged that "[Officer] Delcambre agreed that at his deposition he said that he could not recall and said in his deposition that he did not smell that odor. He says that as of the trial he is saying that he could not smell alcohol." The circuit court determined that, since Lord was not affiliated with any party in this case and did not know either Bernius or Officer Delcambre, "there is no reason at all given as to why Lord's testimony should be [in] question concerning the statement."

8

¶17.    The circuit court ultimately held that, "considering the totality of the circumstances and the applicable law, as well as the admissions of the officers, the officers acted in this case with reckless disregard." The circuit court found that, whether or not they knew or should have known that Bernius was intoxicated, the officers "admittedly appreciated the unreasonable risk to others on the river in allowing a person to recklessly operate a boat and/or to operate at an unreasonable speed." The circuit court explained:

> [The officers] did not exercise any of the care or consideration [that] they were required to do in their dealings with Bernius. They clearly intended that Bernius continue to operate his boat without any restrictions from them and without their having made any inquiries as to his reckless operation, speeding, physical abilities, or use of alcoholic beverages. They "intended to do the act that caused harm to come to the [p]laintiff."

¶18.    The circuit court ultimately rendered a judgment for the Webbs. The circuit court conducted a damages hearing on November 5, 2014, and awarded damages in the amount of $1,400,000 to the guardianship of Shane, and damages of $100,000 to Kathleen, individually and on behalf of Christopher's wrongful-death beneficiaries. After applying the MTCA's statutory cap on damages, the circuit court ultimately entered a final judgment to the guardianship of Shane in the amount of $466,666.67, and to Kathleen, individually and on behalf of Christopher's wrongful-death beneficiaries, in the amount of $33,333.33.

¶19.    The MDWFP now appeals the circuit court's judgment, arguing that the circuit court improperly substituted its judgment and misapplied the reckless-disregard standard. The MDWFP submits that the circuit court's findings and conclusions demonstrate an application of negligence, and not the higher reckless-disregard standard that is required to find the

9

MDWFP liable under the MTCA.

## STANDARD OF REVIEW

¶20. "A circuit court judge sitting without a jury is afforded the same deference as a chancellor." *City of Jackson v. Lewis*, 153 So. 3d 689, 693 (¶4) (Miss. 2014). Accordingly, we will not disturb a circuit court's findings following a bench trial where the findings are supported by substantial, credible, and reasonable evidence. *Id.* However, we must reverse the circuit court's findings where they are manifestly wrong or clearly erroneous, or the court applied an erroneous legal standard. *Id.* "Although reasonable minds might differ on the conclusion of whether or not the officer in question acted in reckless disregard, it is beyond this Court's power to disturb the findings of the trial judge if supported by substantial evidence." *Id.* (citing *City of Ellisville v. Richardson*, 913 So. 2d 973, 978 (¶15) (Miss. 2005)). We review questions of law de novo. *Richardson*, 913 So. 2d at 977 (¶13).

## DISCUSSION

¶21. The MDWFP argues that the circuit court erred in its application of the "reckless disregard" standard. The MDWFP submits that the circuit court focused on whether the officers intended the act that caused the harm and ignored the requirement that the act at issue must be made with knowledge of an unreasonable risk and a high probability of harm. The MDWFP asserts that the evidence fails to support the conclusion that the officers acted wantonly or in utter disregard of an unreasonable risk with a high probability of harm to others.

10

¶22. We recognize that "[t]he MTCA is the exclusive remedy for filing a lawsuit against a governmental entity and its employees." *City of Jackson v. Jackson*, 200 So. 3d 1141, 1144 (¶10) (Miss. Ct. App. 2016) (citing *Brister*, 838 So. 2d at 278 (¶15)). Section 11-46-9(1)(c) provides:

> A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim: . . . [a]rising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury[.]

¶23. Under the MTCA, "immunity applies to an officer acting in the scope of his employment unless it is determined that he acted in reckless disregard of the safety of an individual not engaged in criminal activity." *Jackson*, 200 So. 3d at 1144-45 (¶10). In determining what action constitutes "reckless disregard," we look to guidance from the supreme court. In *Maye v. Pearl River County*, 758 So. 2d 391, 394 (¶19) (Miss. 1999), the supreme court described reckless disregard as a "conscious indifference" to the consequences of an action, almost evincing a "willingness that harm should follow." In the more recent case of *Lewis*, 153 So. 3d at 693 (¶5), the supreme court explained that reckless disregard is "more than mere negligence, but less than an intentional act." (citation omitted). The *Lewis* court further provided that "reckless disregard occurs when the conduct involved evinced not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved." *Id.* (internal quotation marks omitted);

11

*see also Thomas ex rel. Thomas v. Miss. Dep't of Pub. Safety*, 882 So. 2d 789, 796 (¶20) (Miss. Ct. App. 2004) (finding that a police officer's failure to check the driver's sobriety failed to rise to the level of reckless disregard and "that there was sufficient evidence for the trial judge to hold that [the officer's] omission [to check for sobriety] did not rise to the level of gross disregard for [the decedent's] safety").[5]

¶24.    When determining reckless disregard for purposes of defeating immunity relative to law-enforcement duties under the MTCA, this Court applies a totality-of-the-circumstances standard. *Id.* at (¶12).  Upon review, we must utilize an objective standard when determining the nature of the officers' actions, keeping in mind all the factors they were confronted with while also "taking into account the fact that the officers must make split-second decisions." *Id.* (citing *City of Jackson v. Powell*, 917 So. 2d 59, 72 (¶47) (Miss. 2005)).  In so doing, "this Court must consider all of the events that occurred." *Id.*

¶25.    The MDWFP argues that the record fails to contain sufficient evidence to support the circuit court's following findings:  (1) the officers "appreciated a risk" that Bernius would flee; (2) Officers Delcambre and Thrash knew, understood, or realized an unreasonable risk or consciously disregarded a known unreasonable risk; and (3) Bend 2 was not a dangerous section of the river. *See Lewis*, 153 So. 3d at 693 (¶5).  The MDWFP further submits that the circuit court erred by:  (1) applying a negligence standard instead of the standard for

---

[5] A uniform traffic citation may be issued for reckless driving.  Miss. Code Ann. § 63-3-1201 (Rev. 2013); Miss. Att'y Gen. Op., 1992 WL 614053, *Gross* (July 15, 1992).

determining reckless disregard; and (2) failing to find that Bernius's unlawful actions were the intervening and superseding cause of the boating accident.

¶26.   The record reflects that, at the bench trial, the circuit court heard testimony from Officer Thrash; Officer Delcambre; Bond, a conservation officer at the MDWFP who was called to the scene to investigate the accident and BUI charges; and Lord, a witness to the incident on the river.

¶27.   At trial, Officer Thrash testified that he was an expert in boating safety and BUI enforcement.  However, Officer Thrash admitted that the incident at issue on August 22, 2009, was the first time he had been involved in a BUI stop and the first time that someone suspected of reckless boating had ever "run" from him while performing a stop.

¶28.   During cross-examination, Officer Thrash admitted that, as an MDWFP officer, he is obligated to stop any vessel he reasonably suspects is being operated by an individual who may be physically incapacitated and incapable of safely operating the vessel.  Mississippi Code Annotated section 59-21-83 (Rev. 2013) prevents the reckless or negligent operation of watercraft vessels on Mississippi waters and states:

> No vessel shall be operated within this state in a reckless or negligent manner or at a rate of speed greater than is reasonable and prudent under the then existing circumstances or when the operator is so physically or mentally incapacitated as to be incapable of safely operating such vessel, or while the operator is under the influence of intoxicating liquor or narcotics, or when such vessel is overloaded beyond its reasonable carrying capacity.

Officer Thrash testified that he was unable to enforce section 59-21-83 because he never received the chance to do so.  Officer Thrash testified that he stopped Bernius because

13

Bernius was operating his boat in a reckless manner. Officer Thrash explained, however, that he and Officer Delcambre were unable to perform a "complete stop" of Bernius prior to Bernius fleeing because "I pulled up [be]side him, but [with] the wave action and everything I never could get up beside him to do a complete stop."

¶29. Regarding whether or not the officers possessed probable cause to suspect that Bernius was operating the vessel under the influence of alcohol or drugs, Officer Thrash admitted that, during the alleged stop, he did not ask Bernius or his passenger whether they had consumed alcohol. Officer Thrash testified that he could not tell if Bernius's speech was slurred because he only heard Bernius say "Okay" in response to the command for Bernius to follow the officers to the straightaway. Officer Thrash also testified that, during the stop, Bernius "was seated on his boat and he appeared to have good posture," and he was never close enough to Bernius to observe if his eyes were bloodshot. Officer Thrash further stated that Bernius exhibited no behavior anomalies suggesting that Bernius was not in complete control of his faculties. Officer Thrash admitted that it would have been reckless of him to not consider whether Bernius was under the influence of alcohol or drugs before he allowed him to continue to operate his boat. However, Officer Thrash testified that his interaction with Bernius during the stop failed to give him reasonable suspicion that Bernius may have been under the influence. The record reflects that, when Officer Thrash commanded Bernius to follow the officers around the bend to the straightaway to conduct the stop, Bernius remained in control of his boat and followed the officers a short distance before fleeing.

14

¶30.    Officer Delcambre testified that he worked at the MDWFP for approximately twenty-five years and was an expert in boating safety and BUI enforcement.  Officer Delcambre also testified that, between the years 2002 and 2009, he was involved in more than 100 stops for boaters operating their vessels in a reckless manner.

¶31.    Officer Delcambre testified that, because of the blindspot located in the bend where he and Officer Thrash stopped Bernius, he was not close enough to Bernius's boat to be able to assess Bernius's mental, physical, or sensory faculties.  Officer Delcambre explained, "We never engaged [Bernius] in slurred speech.  I never engaged him in a conversation.  I never engaged him in any of that.  My main objective at the point where we made contact was to get him out of the bend of the river."  Officer Delcambre instructed Officer Thrash to tell Bernius to follow the officers around the bend so they could safely question Bernius regarding his excessive speeding and reckless operation of the boat.

¶32.    At the conclusion of the trial, the circuit court entered an order on June 6, 2014, finding that Officers Thrash and Delcambre acted with reckless disregard of the safety and well-being of Shane and Christopher.[6]

¶33.    As stated, "[a] circuit court judge sitting without a jury is afforded the same deference as a chancellor," and we will not disturb a circuit court's findings following a bench trial

_____

[6] In its order, the circuit court stated that the issues before the court were (1) whether the officers' acts and omissions caused or contributed to the accident, and (2) whether those acts or omissions constitute reckless disregard of the safety and well-being of Shane and Christopher.

15

where the findings are supported by substantial, credible, and reasonable evidence. *Lewis*, 153 So. 3d at 693 (¶4). We will reverse the circuit court's findings only upon a determination that the findings are manifestly wrong or clearly erroneous, or the court applied an erroneous legal standard. *Id.* Furthermore, it is beyond the power of this Court to disturb the circuit court's findings regarding a determination of reckless disregard where those findings are supported by substantial evidence. *Id.* (citing *Richardson*, 913 So. 2d at 978 (¶15)). In a bench trial, the trial judge sits as the trier of fact and "has the sole authority for determining the credibility of the witnesses." *City of Jackson v. Lipsey*, 834 So. 2d 687, 691 (¶14) (Miss. 2003).

¶34. Turning to review the circuit court's findings, the record reflects that, in making its determination regarding whether the officers exhibited reckless disregard, the circuit court discussed section 59-21-83, which governs boating safety. Section 59-21-83 provides in pertinent part:

> No vessel shall be operated within this state in a reckless or negligent manner or at a rate of speed greater than is reasonable and prudent under the then existing circumstances or when the operator is so physically or mentally incapacitated as to be incapable of safely operating such vessel, or while the operator is under the influence of intoxicating liquor or narcotics, or when such vessel is overloaded beyond its reasonable carrying capacity.

¶35. The record reflects that the circuit court took issue with the MDWFP officers' request for Bernius to move his boat to a straightaway for safety purposes. The circuit court also discussed two MDWFP SOPs: SOP 04.01, which provides the guidelines for making an arrest, and SOP 07/03, which concerns the guidelines for enforcing the BUI law. The circuit

16

court found that, although both Officers Thrash and Delcambre stated they were aware of section 59-21-83 and the SOPs, they failed to comply with the SOPs.

¶36.   SOP 04.01 provides in pertinent part:

> For violations of laws enforced primarily by [M]DWFP, . . . custodial arrests will be made only for the following violations:
>
> > a) All Class 1 Game and Fish Violations; and
> >
> > b) Violations of the Alcohol Boating Safety Act;
> >
> > c) Narcotic[]s violations[.]
>
> For violations of laws enforced primarily by [M]DWFP other than those named above, a citation should be issued [at] the scene[,] and the defendant should not be detained further except in extraordinary circumstances.

¶37.   In examining SOP 04.01, the circuit court found that the SOP provides that citations are to be issued "at the scene," and it "does not provide that the officers may direct the offending operator to continue to operate his vessel prior to issuing a citation. Specifically, it does not provide for directing an operator to move his vessel to another location."

¶38.   SOP 07/03 provides in pertinent part:

> [I]t shall be part of the mission of [MDWFP] to enforce the laws of the United States and the State of Mississippi on the public waters under the jurisdiction of the State of Mississippi so as to protect all persons from injury and/or loss of life and to safeguard property[.]
>
> . . . .
>
> Once a vessel has been stopped, the Officer may then ascertain if there is further probable cause to suspect that the operator of the vessel is under the influence of alcohol, drugs, or a controlled substance. Evidence to warrant proceeding to the screening/intoxication interview include:

1. Slurred speech;

2. Poor balance (not as convincing when on water due to wave action);

3. Bloodshot eyes; and

4. Other behavioral anomalies that suggest the individual is not in complete control of his or her faculties.

. . . .

If, in the Officer's best judgment, the subject displays outward signs of being under the influence, the Officer shall proceed to the screening interview.

In its order, the circuit court found that SOP 07/03 indicates that an officer "is required upon stopping a vessel to begin his efforts to establish probable cause for BUI."

¶39. The circuit court recognized that both officers confirmed they were familiar with the SOPs, and the circuit court acknowledged Officer Thrash's testimony that "[t]he SOPs never came into effect because they never had the opportunity to put [the SOPs] in effect." The circuit court determined that "this is so, however, only because the officers chose to make it so." As a result, the circuit court held that "the officers did not comply with the SOPs in this case." The circuit court further determined that "it is also clear that the officers gave no consideration to ensuring that Bernius did not continue to recklessly operate his vessel during their trip down the river."

¶40. The circuit court determined that, after the officers performed their initial stop of Bernius for recklessly operating his boat, the officers then lacked authority to direct Bernius

18

to move out of the hazardous area on the river.[7]  Precedent, however, reflects that speeding

and reckless-driving citations are treated significantly differently from driving-under-the-

influence arrests.

¶41.    The circuit court also found that the officers' defense rested solely on their position

that their boats and Bernius's boat were stopped in a dangerous bend of the river and

blocking a portion of the river, and that the officers wanted to move the boats around the

bend and down river to a different point in the straightaway before proceeding to determine

why Bernius had been reckless and speeding.  The circuit court acknowledged the officers'

argument that this was a reasonable and necessary judgment on their part, and not reckless

disregard.  However, the circuit court held that "the officers' well-rehearsed mantra of Bend

2 being a blind, dangerous curve is not supported by evidence in the record."  The circuit

court explained that only Officers Thrash and Delcambre testified as to the bend's

dangerousness.  The circuit court stated that the photos of the bend admitted into evidence

"do not lend themselves to any real assessment that [B]end 2 is a blind curve or dangerous

curve," and the court pointed to Officer Delcambre's testimony that no warning signs

appeared at Bend 2 concerning any danger or hazard.

¶42.    The circuit court found the facts of *Brister,* 838 So. 2d at 281 (¶23), to be similar to

the case at hand.  In *Brister*, the supreme court found the fact that the officers in that case did

not intend an accident to occur was "of no concern," and it opined that the officers exhibited

---

[7] *See* Miss. Code Ann. § 59-21-83.

19

"conscious indifference knowing they had not complied with . . . the existing governing policy of the police department at that time." *Id.* The supreme court explained that, "[w]ithout adhering to that policy, the officers should have reasonably expected the possibility of adverse consequences[,] including a fatal accident[;] thus plaintiffs clearly proved reckless disregard to the general public safety." *Id.* However, *Brister* addresses a case of high-speed pursuit only and does not address an officer's discretion to conduct a stop in a safe area that does not obstruct traffic.

¶43. Mississippi precedent establishes that a violation of a SOP does not alone establish reckless disregard. *City of Jackson v. Presley*, 40 So. 3d 520, 524 (¶16) (Miss. 2010). Rather, reckless disregard constitutes "more than mere negligence, but less than an intentional act," and must be shown by conduct that evinces "not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved." *Jackson*, 200 So. 3d at 1145 (¶11).

¶44. In *Thomas*, this Court examined a case where an intoxicated driver was issued a speeding ticket but the police officer failed to check the driver's sobriety during the traffic stop. *Thomas*, 882 So. 2d at 791 (¶3). The driver later wrecked his vehicle, resulting in the death of his son, who was a passenger in the car. *Id.* at (¶4). In reviewing the case, this Court found the circuit court applied a reckless-disregard standard under the MTCA for immunity for liability for the Mississippi Department of Public Safety (MDPS) and its officer who issued the speeding ticket but failed to check the driver's sobriety. *Id.* at 793 (¶14).

20

This Court affirmed the circuit court's judgment that the officer's failure to check the driver's sobriety failed to rise to the level of reckless disregard, and we explained "that there was sufficient evidence for the trial judge to hold that [the officer's] omission [to check for sobriety] did not rise to the level of gross disregard for [the decedent's] safety." *Id.* at 796 (¶20). *See also* Miss. Code Ann. § 11-46-9(1)(c) (discussing reckless disregard).

¶45. The *Thomas* court distinguished its facts from those in *Turner v. City of Ruleville*, 735 So. 2d 226, 230 (¶21) (Miss. 1999), explaining that, "[i]n *Turner*, the court found reckless disregard on the part of a police officer who allowed a visibly intoxicated driver to continue driving." *Id.* at 797 (¶23). The *Thomas* court held that, in the case before it, "it was not obvious . . . that [the driver] was intoxicated" based on the MDPS officer's observations of the driver during the traffic stop. *Id.* The *Thomas* court ultimately determined that "[t]here is no evidence that [the driver] was visibly intoxicated while he was in [the MDPS officer's] presence." *Id.*

¶46. In *Bradley v. McAllister*, 929 So. 2d 377, 380 (¶12) (Miss. Ct. App. 2006), this Court acknowledged that, in cases where "officers were held to have acted in reckless disregard of the safety of others[,] . . . [t]he common thread . . . is that the conduct involved evinced not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved." (internal quotation marks omitted) (citing *Lipsey*, 834 So. 2d at 693 (¶21)).

¶47. In the case before us, the circuit court found that the officers' conduct violated the

21

applicable SOP, and thus, the court held that the officers' violation of this SOP by requesting that Bernius follow them to a straightaway and out of the hazardous area of the river supported a finding of reckless disregard. However, a review of SOP 04.01 reflects no provision prohibiting officers from requesting a boater pull to a safe area to conduct a traffic stop.[8] Furthermore, we find that the violation of this SOP fails to necessarily establish reckless disregard by the officers.

¶48. The record reflects that the Tchoutacabouffa River constituted a public Mississippi waterway.[9] In the context of probable cause and traffic stops, Mississippi precedent reflects that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Adams v. City of Booneville*, 910 So. 2d 720, 723 (¶10) (Miss. Ct. App. 2005) (citing *Henderson v. State*, 878 So. 2d 246, 247 (¶8) (Miss.

---

[8] SOP 04.01 provides in pertinent part:

For violations of laws enforced primarily by [M]DWFP, . . . custodial arrests will be made only for the following violations:

  a) All Class 1 Game and Fish Violations; and

  b) Violations of the Alcohol Boating Safety Act[;]

  c) Narcotic[]s violations[.]

For violations of laws enforced primarily by [M]DWFP other than those named above, a citation should be issued [at] the scene[,] and the defendant should not be detained further except in extraordinary circumstances.

[9] *See* Miss. Code Ann. § 1-3-31 (defining navigable waters); Miss. Code Ann. § 51-1-4 (discussing the use of public waterways); Miss. Code Ann. § 59-23-3(e) (defining public waters).

22

Ct. App. 2004)).[10] Clearly, the MDWFP possessed both the authority to regulate the boating traffic on the Tchoutacabouffa River and the discretion to do so in a safe manner. Disobeying an officer's direction to pull over is a violation of the law. *See* Miss. Code Ann. § 97-9-72 (Rev. 2014); *see also* Victor W. Carmody, Kevin T. Stewart & Lance O. Mixon, *Mississippi DUI Law and Practice* § 13:1 (2012). The United States Supreme Court has held that an officer who lawfully stops an automobile for a traffic violation has the right to order the driver to step out of the automobile. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977). The Court explained that, "[w]hat is at most a mere inconvenience[,]" such as ordering a driver to exit his vehicle, "cannot prevail when balanced against legitimate concerns for the officer's safety." *Id.*[11]

¶49.    In applying the law applicable to traffic stops to the instant case, due to public interest in the officers' safety when conducting a stop, we find that the officers here possessed the discretion to request that Bernius pull out of the hazardous and high-traffic area of the river. Therefore, after reviewing the record, and keeping in mind our standard of review, we find the circuit court erroneously applied the legal standard for reckless disregard to this case. *See Thomas*, 882 So. 2d at 796 (¶20). The evidence failed to show that the officers' conduct

[10] *Terry v. Ohio*, 392 U.S. 1 (1968).

[11] The Supreme Court has balanced the law-enforcement interest in having the driver exit the vehicle against the interest of the driver's privacy. Two public-interest concerns supported the exit order: (1) the officer's safety in avoiding violent confrontations possible in any traffic stop, and (2) minimizing the hazardous accidental injury from passing traffic. *See Maryland v. Wilson*, 519 U.S. 408, 413-14 (1997); *Mimms*, 434 U.S. at 111; *see generally Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996).

23

"evinced not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved." *See Bradley*, 929 So. 2d at 380 (¶12). As a result, we find the circuit court's judgment lacks credible and substantial evidentiary support. We therefore reverse the circuit court and render judgment in favor of the MDWFP.

¶50. **THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT, IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.**

**IRVING AND GRIFFIS, P.JJ., FAIR, WILSON AND GREENLEE, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE OPINION. LEE, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY ISHEE AND WESTBROOKS, JJ. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J.; ISHEE, J., JOINS IN PART.**

**LEE, C.J., DISSENTING:**

¶51. I join in Judge Westbrooks's dissent, but I write separately to emphasize that it is our standard of review that compels me to do so. "When reviewing the circuit court's fact-based findings, we only examine whether the circuit court abused its discretion and whether the record contained substantial credible evidence to support the decision." *Booth v. Williams*, 200 So. 3d 1053, 1061 (¶26) (Miss. Ct. App. 2016). While the particular facts of this case are such that I may have decided it differently, our law precludes me from doing so. Our standard of review dictates that "we must affirm the [circuit court's] decision, regardless of what any of us individually might have ruled had we been the judge, unless there is a definite and firm conviction that the court below committed clear error." *Ferguson v. Univ. of Miss.*

24

*Med. Ctr.*, 179 So. 3d 1060, 1064 (¶17) (Miss. 2015) (internal quotation marks omitted). After reviewing the record, I cannot agree with the majority that the circuit court abused its discretion or that there was not substantial credible evidence to support its findings. As such, I would affirm the judgment of the circuit court and thus, respectfully dissent.

**ISHEE AND WESTBROOKS, JJ., JOIN THIS OPINION.**

**WESTBROOKS, J., DISSENTING:**

¶52. I am of the opinion that there is substantial, credible, and reasonable evidence to support the trial court's finding of reckless disregard. Therefore, I respectfully dissent.

**DISCUSSION**

¶53. MDWFP Officers Michael Thrash and Barry Delcambre[12] witnessed a boat traveling on the Tchoutacabouffa River speeding and operating in a reckless and uncontrollable manner. There was testimony presented that the officers saw Bernius being "propped up" (back to back) by a passenger while Bernius was operating the boat. The officers stopped Bernius in Bend 2, which is a part of the river the officers contended is a dangerous area. The officers did not inquire whether Bernius was able to operate his boat at this time. Instead, Officer Thrash instructed Bernius to move to a straightaway down the river. Officer

---

[12] At the time of the crash, Officer Thrash had been employed by MDWFP for just over two and a half years. He received his BUI training roughly two months prior to the accident. According to testimony, this stop was the first time he had ever been involved in a BUI stop or investigation. Officer Delcambre had been employed by the MDWFP for twenty-two years at the time of the accident. He had been involved with over one hundred stops for reckless operation of a vessel.

Delcambre proceeded down the river ahead of Officer Thrash, and Bernuis was ordered to follow Officer Thrash. According to Officer Delcambre's testimony, they were going to move about one hundred fifty yards down the river to further talk to Bernius. At this time, both officers were in front of Bernius.

¶54. Bernius followed the officers out of Bend 2, then turned his boat around and recklessly sped off in the opposite direction. John Joachim, a witness of the accident, was traveling down the river and observed Bernius recklessly speeding on the wrong side of the river, traveling away from the officers. Joachim testified he had to maneuver his boat to avoid a collision with Bernius.

¶55. A few moments later, Bernius crashed into a boat operated by Christopher Webb. It is unclear how far away Bernius traveled away from the officers; however, the officers did not witness the crash. Christopher was killed in the crash, and Shane Webb and Kailer Harper, passengers on Christopher's boat, were injured. Bernius and a passenger on Bernius's boat, Dexter Bouie, were thrown into the water. Neither Bernius nor Bouie was seriously injured. The Webbs[13] filed suit against the MDWFP under the MTCA. The Webbs

---

[13] Candace Webb, legal guardian for Shane Webb, and Thomas Harper, legal guardian of Kalier Webb filed suits against MDWFP charging that the officers acted with reckless disregard for the safety of Shane and Kailer. These cases were consolidated against MDWFP. Kathleen Webb, on behalf of the wrongful-death beneficiaries of Christopher Webb, brought suit against MDWFP, Bernius, and Victor Harrington (legal owner of the boat operated by Bernius). The claims were heard pursuant to the Mississippi Torts Claims Act (MTCA). As a result, all three cases were consolidated against MDWFP. No damages were sought on Kailer's behalf. Therefore, this appeal discusses the case on behalf of Christopher Webb and Shane Webb ("Webbs").

asserted the officers acted with reckless disregard for the safety of others.

¶56. The trial court held that the officers' conduct in directing Bernius out of the bend was in reckless disregard for the safety of the public. I agree. The majority opines that the officers' deviation from the MDWFP SOPs (standard operating procedures) did not amount to the deliberate disregard for the safety of others. We do not believe that deviating from standard procedure alone is dispositive of the issue of reckless disregard. However, here it is one of the factors the trial court considered alongside the totality of the circumstances to render a finding of reckless disregard. The trial court determined that "the parties have cited numerous cases from the appellate courts of Mississippi." "A review of those cases clearly reveals that, while there are guidelines for applying the reckless disregard standard, the ultimate decision concerning recklessness is very much fact-driven, hence the totality of the circumstances requirement." I agree with the trial court's findings.

¶57. "Based on our standard of review, the circuit judge's findings are safe on appeal if they are supported by substantial, credible, and reasonable evidence." *City of Jackson v. Brister*, 838 So. 2d 274, 278-79 (¶19) (Miss. 2003). "Furthermore, in a bench trial such as the case at bar, when the trial judge sits as the finder of fact, he has the sole authority for determining the credibility of witnesses." *Id*. (citations omitted). I find the evidence supports a finding that the officers acted in reckless disregard for public safety, because they did not conduct the stop or control Bernius properly. In *Brister*, the court upheld a trial court's finding of reckless disregard involving two police officers in pursuit of a vehicle. *Id*.

27

at 281 (¶24). A driver was killed as a result of the pursuit. *Id*. at 276 (¶1). The court held:

> Thus, the fact here that the officers did not intend that a fatal accident would result as a direct consequence of their high speed chase in violation of Jackson Police Department existing written policy is of no concern. Brister need only show that the officer actions rose to the level of recklessness. Here, it is sufficient that Brister has shown, and the trial judge so found, that the officers initiated a high speed chase with *conscious indifference* knowing they had not complied with Order 600–20 which was the existing governing policy of the police department at that time.

*Id.* at 281 (¶23) (emphasis added) (internal citations and quotations marks omitted). In this case, both officers allowed Bernius to continue to operate his boat without any restrictions, even though it was against the SOP regarding reckless operation of the boat. Both officers admitted that no distance of operation is permitted for a reckless operator or an operator under the influence of alcohol. As a result of the officers' conscious indifference for failure to control Bernius after they made contact with him, the trial court found their actions rose to the level of reckless disregard, and I agree.

¶58. "Reckless disregard is more than mere negligence, but less than an intentional act." *City of Jackson v. Law*, 65 So. 3d 821, 826 (¶17) (Miss. 2011) (citations omitted). "Reckless disregard occurs when the conduct involved evinced not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved." *Id.* (internal quotation marks omitted). Bernius was allowed to operate his boat at such a reckless speed after the stop was made that neither of the officers actually witnessed the accident. This demonstrates the officers' failure to control Bernius after the stop. Neither of the officers noticed that Bernius turned his boat around in the

28

opposite direction and proceeded to speed again after the stop. Moreover, neither of the officers took the steps to ensure Bernius was not drunk while operating the boat. The trial court found that neither Officer Thrash nor Officer Delcambre performed any investigation, obtained any information, or made any informed decision regarding Bernius's continued operation of the boat. According to the SOP manual, the officers were required to determine the reason Bernius was operating his boat in a reckless manner, issue a citation, and investigate to determine whether Bernius was intoxicated. However, the officers chose not to follow those procedures in this case.

¶59. The SOP 07/03 provides, in part, as follows:

. . . .

Once a vessel has been stopped, the Officer may then ascertain if there is further probable cause to suspect that the operator of the vessel is under the influence of alcohol, drugs, or a controlled substance. Evidence to warrant proceeding to the screening/intoxication interview include:

1. Slurred speech;

2. Poor balance (not as convincing when on water due to wave action);

3. Bloodshot eyes; and

4. Other behavioral anomalies that suggest the individual is not in complete control of his or her faculties.

Officers Thrash and Delcambre testified they did not witness any behavioral abnormalities demonstrating that Bernius was not in complete control of his faculties or intoxicated. However, Joshua Lord, a witness at the trial, testified Officer Delcambre told another officer

29

that Bernius was stopped, because he observed someone propping Bernius up (back to back) while he (Bernius) was operating the boat. Officer Delcambre disputes Lord's testimony regarding his statement. However, the trial court noted that Lord was an uninterested party in the matter and did not appear to have any reason to be untruthful. Officer Thrash testified he noticed Bernuis's wheelchair and colostomy bag after he approached Bernius on the boat. This Court recognizes that the presence of a wheelchair does not in and of itself suggest one is not control of his faculties. However, the presence of the wheelchair and colostomy bag coupled with being propped up while recklessly operating the boat should have given the officers enough heightened awareness to conduct an investigation of some kind in that moment. Moreover, trial counsel asked Officer Thrash if he had a heightened awareness that he had just stopped a boat driving at a recklessly high speed, and that the operator of the boat may have some significant physical issues. He replied in the affirmative. However, the officers chose neither to inquire nor control Bernius at that time.

¶60. After the crash, Bernius's BAC was .25 percent – well above the .08 percent legal limit. While Bernius's BAC level was taken after the incident, the evidence calls into question the officers' credibility regarding Bernuis's demeanor and reckless operation of the boat before the accident. Lord testified he detected a strong smell of alcohol coming from Bernius, yet Bernius never uttered a word to him. The evidence shows that a mere investigation or issuance of a citation after stopping the boat would have put the officers on notice of a potential BUI situation. This type of investigation is required under suspicion of

30

BUI according to the BUI handbook.

¶61.   Officer Thrash also testified he did not come to a complete "stop" because of wave action. However, at the time contact was made with Bernius, his boat had halted and had not continued to move. Bernius's boat did not move again until Officer Thrash ordered him to follow behind him. Interestingly, Officer Thrash testified he was close enough to Bernius to ask Bernius to follow him; however, Officer Thrash did not at least ask Bernius if he had been drinking (as required by the BUI-stop manual). More importantly, both officers admitted they did not have the authority to make their own guidelines regarding the stop, yet they deviated from the SOP.

¶62.   In *Turner v. City of Ruleville*, 735 So. 2d 226, 227 (¶2) (Miss. 1999), Trista Turner was injured in a collision with a drunk driver. Turner filed a complaint in Sunflower County Circuit Court against the drunk driver and the City of Ruleville, "alleg[ing] that although [the officer] knew that [a drunk driver] was intoxicated and incapable of driving his vehicle in a safe and prudent manner, [the] [o]fficer allowed [the drunk driver] to continue driving." *Id*. "This, Turner charged, constituted reckless disregard of the safety and well being of Turner and others traveling on the highway who were not engaged in criminal activity at the time of injury." *Id*. The court found that "because willful and wanton are synonymous with reckless disregard[,] and because the officer was alleged to have acted willfully and wantonly, the complaint did state a claim upon which relief could be granted." *Id*. at 230 (¶22). The facts in this case are somewhat analogous to *Turner*. By allowing Bernius to

31

operate his boat after the initial stop and failure to control him, the officers demonstrated a reckless disregard for the public's safety and the reckless disregard for Bernius's safety.

¶63.    "The supreme court has[,] however[,] analyzed cases in which officers were held to have acted in reckless disregard of the safety of others in other contexts." *Bradley v. McAllister*, 929 So. 2d 377, 380 (¶12) (Miss. Ct. App. 2006). "The common thread of these cases is that the conduct involved evinced not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved." *Id*. (citation and quotation marks omitted). In this case, both officers admitted they were obligated to enforce, without exception, the boating laws of Mississippi. The officers asserted the area where they initially stopped Bernius was dangerous, and they agreed to move to a safer location for a stop. However, the trial court found that the officers did not present any evidence that the bend was dangerous other than their own testimony. No "hazardous" or "warning" signs were posted during the time of the crash around Bend 2. No pictures were offered of Bend 2 from the angle in which the officers argued their boats were coming from. The photographs admitted into evidence showed a pier protruding into the river. However, Officer Thrash gave testimony that he did not dock at the pier, because the three boats would have blocked traffic there. However, the trial court found no evidence to support that testimony. The trial court found that surely other boaters would be able to see three boats before coming too close to avoid contact. This conscious indifference of the officers to deviate from the SOP manual resulted in a failure-to-control situation. The trial

court determined that, "It is also clear that the officers gave no consideration to ensuring that Bernius did not continue to recklessly operate his vessel during their trip down the river." The officers' conduct evinced not only some appreciation of the unreasonable risk involved (deviation from SOP), but also a deliberate disregard of that risk by allowing Bernius to continue operating the boat and not conducting a BUI investigation at the stop.

¶64. The majority applies the laws dealing with traffic stops to this case. They opine that the officers possessed the discretion to request Bernius to pull out of the hazardous and high-traffic area of the river. I assert this is a case of "failure to control" during and after a stop. I am of the opinion that a "stop" of a boat carries greater risk and requires more thought for the safety of the public. Therefore, when the officers deviated from the manual, at a minimum, they should have taken further precaution by asking a simple question and gaining control over Bernius's ability to operate his boat. The SOPs and laws regulating boating safety exist to ensure that accidents of this nature do not occur. Therefore, under the totality of the circumstances, I opine the officers' actions were such that a trial court could render a finding of reckless disregard for the safety of others.

¶65. Respectfully, I dissent.

**LEE, C.J., JOINS THIS OPINION; ISHEE, J., JOINS THIS OPINION IN PART.**