# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2011-CA-01063-SCT

*CITY OF JACKSON, MISSISSIPPI*

*v.*

*ROBERT SANDIFER, JR. AND MILDRED SANDIFER, INDIVIDUALLY AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF TAWANDA SANDIFER*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/12/2011 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | KIMBERLY BANKS |
| | PIETER TEEUWISSEN |
| ATTORNEYS FOR APPELLEES: | PRECIOUS MARTIN, SR. |
| | SUZANNE KEYS |
| | BENNIE L. RICHARD |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND RENDERED - 02/21/2013 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1. In this Mississippi Tort Claims Act (MTCA) case, we must determine whether the Circuit Court of Hinds County, Mississippi, erred in finding the City of Jackson (the City) liable for the death of Tawanda Sandifer. Finding error, we reverse the judgment of the circuit court and render judgment in favor of the City.

## FACTS AND PROCEDURAL HISTORY

¶2.    Tawanda Sandifer was a chronic runaway. Tawanda's mother, Mildred Sandifer, testified at trial that Tawanda had excelled in elementary school; however, she began having trouble and behavioral problems by the time she began seventh grade. In 2003, when Tawanda was thirteen years old, she began running away from home for extended periods of time. Tawanda ran away approximately seventeen times before she ran away for the last time in April 2005.

¶3.    Mildred testified that Tawanda's relationship with her father, Robert Sandifer, was strained to the point that they could not even be in the same room with each other and refused to say each other's names. Mildred testified that part of the reason Tawanda ran away was because of her father's discipline, and that one of Tawanda's sisters[1] also had run away to avoid getting in trouble with their father.

¶4.    Mildred testified that she had filed a runaway petition for Tawanda every time she had run away, and that Jackson Police Department (JPD) had taken Tawanda into custody on a few occasions.[2] While several runaway petitions were introduced at trial, the Sandifers did not present a runaway petition signed after April 2005. Additionally, JPD Officer Joe Wade, the City's representative, testified that he was not able to locate a runaway petition signed after April 2005.

---

[1]Tawanda was the middle child of three girls.

[2]After a minor runs away, family members must file a runaway petition with the youth court if they want the police department to detain the minor if she is found. Police officers have no authority to take a runaway into custody unless such a petition is filed. Furthermore, a detention center will not accept a minor unless there is a runaway petition, signed by the family, on file.

¶5.     Tawanda often returned home approximately two weeks after she ran away. Mildred testified that, if Tawanda came home after the family had filed a runaway petition, the Sandifers were required to call the police to come and pick up Tawanda and take her to the detention center, where she would stay approximately twenty-four hours before there would be some court proceedings and a judge would "just send her home." However, Tawanda never remained at home long after she returned. On at least one occasion after she had returned home, Tawanda told the police who came to transport her to the detention center that she could not stay at her parents' home anymore. Mildred also testified that she asked the court to send Tawanda to "training school," but she was told they couldn't do that because Tawanda had not broken any laws or committed a crime.

¶6.     In September 2004, Tawanda ran away and eventually was taken into custody by the JPD. During her detention, Tawanda, who was fourteen years old at the time, gave a written statement to JPD Detective Wanda Camel listing several men she had engaged in sexual activity with, including JPD Officer Maurice Clark. Tawanda told Detective Camel that she had met Clark at his apartment.[3] Tawanda further reported that she did not know everyone she had slept with because she had gotten so "drugged, drunk, and or high" that she didn't remember all the faces or names. Mildred testified that she and Tawanda went to meet with Detective Camel to discuss the allegations against Clark in December 2004, but that she was never contacted by the JPD regarding the allegations after that meeting. However, there is evidence that Detective Camel put together a nonsuggestive photo lineup for Tawanda to

---

[3]Clark's roommate told JPD after Tawanda's death that he and Clark had met Tawanda when she was hanging around an apartment building while they were moving in, and she asked to stay at their place.

3

identify Clark. While it appears that an investigation into Tawanda's 2004 allegations began, the outcome of the 2004 investigation is not clear.[4]

¶7. In September 2004, Tawanda was evaluated by Dr. Nanolla Yazandi, a youth-court psychologist. Dr. Yazandi described Tawanda as depressed, and recommended Tawanda begin long-term psychiatric treatment. In October 2004, Tawanda was admitted to Behavioral Healthcare of Mississippi (Brentwood) for treatment. Tawanda's medical records indicate that Tawanda had anger and impulse-control issues and that she drank heavily, used drugs, and sold drugs. Tawanda reported to her medical providers that her relationship with her father was a big stressor in her life and that she ran away because she did not get along with him. Tawanda also stated that she wanted to live with her grandmother. At one point, Tawanda told her medical providers that she did not want to change and that therapy was not going to help her.

¶8. Tawanda was discharged from Brentwood in November 2004. Mildred testified that Tawanda had been prescribed medication for depression, which seemed to help. However, Tawanda soon slipped back into her old routine, running away for longer periods of time and calling home so drunk and high that she couldn't even identify who she was. As a result, Tawanda was admitted to Brentwood for a second time on March 15, 2005. Although Tawanda's psychiatrist, Dr. Douglas Byrd, found on March 17, 2005, that Tawanda would benefit from long-term residential treatment due to the chronic nature of her behavioral and emotional problems, Tawanda was discharged from Brentwood on March 22, 2005. At the

---

[4]Detective Camel was on medical disability leave at the time of trial and did not testify.

4

time she was discharged, Tawanda was described as "completely oriented and happy." Unfortunately, less than a month later, Tawanda ran away for the last time.

¶9.    On January 9, 2006, approximately nine months after running away, Tawanda died as a result of blunt-force trauma after being beaten by her boyfriend, Toice Wilson. Tawanda was fifteen years old when she died.[5]  Tawanda and Wilson had been involved since Tawanda was in seventh or eighth grade, beginning when Wilson had stopped Tawanda on the street to inquire as to whether he could pay her for sexual activities.  Wilson testified at trial that Tawanda had told him her name was Tawanda McKenzie, that she was eighteen years old, and that she was from Houston, Texas.  Wilson also knew Tawanda as Pumpkin, Kera, Kim, and Daja. Wilson testified that he began to see Tawanda every few days after their initial meeting.  However, Wilson was married the entire time he and Tawanda were involved, and Tawanda eventually became jealous.

¶10.    Wilson testified that his relationship with Tawanda began to change around Thanksgiving 2005, when she became angry that Wilson was not spending enough time with her, and she encouraged him to leave his marriage.  In November 2005, Tawanda began coming to Wilson's house, where he lived with his wife, and leaving notes for him on his car. In early January 2006, Tawanda came to Wilson's house on two occasions, once breaking his car's windows, and once slashing his car's seats and breaking CDs in the car.  After the seat-slashing incident, Wilson attempted to break off contact with Tawanda; however, a few days later, Wilson found Tawanda pouring gas around his house, trying to set it on fire.

---

[5]The circuit court found that Tawanda was sixteen years old at the time of her death. However, Tawanda was born in April 1990 and died in January 2006.

5

Wilson and Tawanda had a physical altercation, then drove in Wilson's car to Presidential Hills Park in Northwest Jackson. Wilson then beat Tawanda and left her in the park, where she ultimately died as a result of blunt-force trauma. Wilson, who has no connection to the City of Jackson or JPD, pleaded guilty to murder and is serving a life sentence in the custody of the Mississippi Department of Corrections.

¶11. After Tawanda's body was found, the investigation into her death revealed the name "K.T." in her cell phone. When the investigating officers called the number, JPD officer Kenneth Talton answered the phone. Talton stated to the JPD officers that he had met Tawanda in December 2005, when he saw her crying on the street. Talton stated that Tawanda told him her name was "Kaylee," that she was eighteen years old, that she was from Houston, Texas, and that she was fighting with her boyfriend. Talton claimed he thought Tawanda was "Kaylee" until he was told otherwise after her death.

¶12. Ricky Robinson, who conducted the JPD internal affairs investigation into the allegations against Clark and Talton, testified that Talton had stated that Tawanda was crying when he first met her, and Talton had thought she was possibly on medication. After running a warrant check on "Kaylee," Talton dropped Tawanda off at her aunt's house. Although a JPD general order states that an officer should notify dispatch when transporting a civilian, Talton did not do so when he gave Tawanda a ride. Additionally, Talton admitted he gave his phone number to Tawanda and that he had oral sex with Tawanda at his nephew's house.

¶13. Tawanda's parents, on behalf of her wrongful-death beneficiaries, filed suit against the City of Jackson, Talton, and Clark, in their official and individual capacities, for, among other claims, the wrongful death of Tawanda. The Sandifers allege that the City caused or

6

contributed to Tawanda's death by ignoring its own policies with regard to runaways; by failing to investigate Tawanda's claims in 2004 that she was having sex with a JPD officer; by negligently failing to train, hire, supervise, instruct, monitor or control its employees; by failing to maintain an adequate system to hire, train, supervise, instruct, monitor, and/or control its employees; by allowing Tawanda to be subjected to assault, battery, physical, mental, and sexual abuse; and by failing to timely apprehend Tawanda and deliver her to her parents and other appropriate agencies despite knowledge of her status as a runaway.

¶14. After a bench trial, the circuit court found the City liable for Tawanda's death. Specifically, the circuit court found that Talton and Clark had been acting within the course and scope of their employment during their encounters with Tawanda, and that the City's failure to investigate the 2004 allegations, coupled with the repeated sexual encounters, constituted reckless disregard for Tawanda's status as a runaway. The circuit court further found that, although Tawanda's "physical death was caused by the blows from Toice Wilson," JPD employees put her "in a place of danger," which contributed to her death.

¶15. The circuit court ultimately concluded that the City's failure to fully investigate Tawanda's case "caused [Tawanda] to succumb to the brutal and fatal actions of Toice Wilson" and that Wilson and the City were jointly responsible for Tawanda's death. The circuit court assessed damages in the amount of $1 million for Tawanda's death, and further found that the City and Wilson were each fifty percent at fault. Therefore, the circuit court entered judgment against the City in the amount of $500,000, the maximum amount allowed under the MTCA. The City filed this appeal.

**DISCUSSION**

## I. Standard of Review

¶16. A circuit court judge sitting without a jury is afforded the same deference as a chancellor.[6] We will not disturb a circuit court's findings after a bench trial unless "they are manifestly wrong, clearly erroneous, or an erroneous legal standard was applied."[7] The proper application of the MTCA is a question of law, which we review de novo.[8]

## II. Governmental Liability Under the MTCA

¶17. "A state may not be sued except by its consent."[9] However, Mississippi has waived immunity under certain circumstances.[10] These circumstances are addressed in the MTCA, which provides the exclusive civil cause of action against a governmental entity, such as the City.[11]

¶18. Importantly, governmental immunity is waived for employee misconduct only if an employee is acting within the course and scope of his employment.[12] The MTCA specifically provides that "an employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable or be considered to have

---

[6]*City of Jackson v. Powell*, 917 So. 2d 59, 68 (Miss. 2005) (citation omitted).

[7]*Id.* (citation omitted).

[8]*Id.* (citation omitted).

[9]*Powell*, 917 So. 2d at 73 (citing *Hall v. State*, 79 Miss. 38, 29 So. 994 (1901)).

[10]*Powell*, 917 So. 2d at 73.

[11]Miss. Code Ann. §§ 11-46-1 to 11-46-23 (Rev. 2012). *See also Powell*, 917 So. 2d at 69.

[12]*Powell*, 917 So. 2d at 73.

waived immunity for any conduct of its employees if the employee's conduct constituted .

. . *any criminal offense.*"[13]

¶19.    The MTCA further limits governmental liability in pertinent part as follows:

> (1) A governmental entity and its employees acting *within the course and scope of their employment or duties* shall not be liable for any claim:
>
> . . .
>
> (c) Arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police . . . protection *unless the employee acted in reckless disregard* of the safety and well-being of any person not engaged in criminal activity at the time of injury . . . .[14]

"Reckless disregard is a higher standard than gross negligence and 'embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act.'"[15] Additionally, reckless disregard is generally "accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow."[16]

¶20.    Governmental entities also are immune from liability for any claim "based upon the exercise or performance or the failure to exercise or perform a *discretionary* function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused."[17] "A two-part 'public policy function' test is applied to determine whether conduct

---

[13]Miss. Code Ann. § 11-46-7(2).

[14]Miss. Code Ann. § 11-46-9 (emphasis added).

[15]*City of Jackson v. Presley*, 40 So. 3d 520, 523 (Miss. 2010) (quoting *Collins v. Tallahatchie County*, 876 So. 2d 284, 287 (Miss. 2004)).

[16]*Presley*, 40 So. 3d at 523 (citing *Maldonado v. Kelly*, 768 So. 2d 906, 910 (Miss. 2000)).

[17]Miss. Code Ann. § 11-46-9(1)(d) (emphasis added).

is considered a discretionary function subject to immunity."[18]  First, we must determine whether the conduct involved an element of choice; if so, we must then "determine whether that choice or judgment involved social, economic, or political-policy considerations."[19] Each of these exceptions must be considered here and, to recover on their claims against the City, the Sandifers must prove that the officers' alleged misconduct was within the course and scope of their employment, was not criminal, was in reckless disregard of Tawanda's safety, and was not discretionary.

### III.    The City is immune from liability for the alleged employee misconduct.

¶21.    The circuit court based its finding that the City was liable for Tawanda's death on several alleged instances of JPD employee misconduct, specifically Clark's sexual contact with Tawanda; Talton's sexual contact with Tawanda; the JPD's failure to fully investigate Tawanda's allegations regarding Clark in 2004; and Talton's and Clark's failure to take Tawanda into custody after she last ran away in April 2005.  We address the City's liability for Clark's and Talton's alleged sexual misconduct together, and for the remaining alleged misconduct individually.

### *Clark and Talton's Sexual Contact with Tawanda*

¶22.    The circuit court found that both Clark and Talton had sex with Tawanda while they were employed by JPD, and that JPD had evidence in 2004 that one of its officers was engaging in criminal activity.  The circuit court further found that both Clark and Talton were

---

[18]*Pratt v. Gulfport-Biloxi Reg'l Airport Auth.*, 97 So. 3d 68, 72 (Miss. 2012) (citing *Miss. Transp. Comm'n v. Montgomery*, 80 So. 3d 789, 795 (Miss. 2012).

[19]*Pratt*, 97 So. 3d at 72 (citing *Montgomery*, 80 So. 3d at 795).

10

acting within the course and scope of their employment "so long as they were on the job." The circuit court then concluded that JPD's knowledge of the criminal activity was "enough to overcome the presumption that state entities are not liable for the criminal actions of employees."

¶23. We find that the circuit court erred in finding the City is liable for Clark's and Talton's sexual contact with Tawanda. The language of the MTCA clearly provides that an "employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable" for the conduct of its employees if such conduct constitutes "any criminal offense."[20] In this case, the Sandifers allege that Clark and Talton engaged in sexual acts with Tawanda which constitute criminal offenses,[21] and the City does not dispute that the sexual acts, if they occurred, constitute criminal conduct. Furthermore, the circuit court expressly found that Clark and Talton had committed *criminal* offenses by engaging in sexual acts with Tawanda, including statutory rape.

¶24. The circuit court cited no authority for its determination that the MTCA provides a rebuttable "presumption" that governmental entities are not liable for the criminal acts of their employees, and we are not aware of any support for this proposition. We conclude that

---

[20]Miss. Code Ann. § 11-46-7(2) (Rev. 2012). *See also* **L. T. ex rel Hollins v. City of Jackson**, 145 F. Supp. 2d 750, 757 (S.D. Miss. 2000) (finding that plaintiff's claims against the City of Jackson, alleging sexual assault by a JPD officer, would be precluded under the MTCA to the extent the alleged conduct was criminal).

[21]Mississippi Code Section 97-3-95(1)(c) provides that "a person is guilty of sexual battery if he or she engages in sexual penetration with . . . a child at least fourteen (14) but under sixteen (16) if the person is thirty-six (36) or more months older than the child . . . ." Miss. Code Ann. § 97-3-95(1)(c) (Rev. 2006). Tawanda was over fourteen and under sixteen at the time she allegedly had sexual contact with Clark and Talton, who both were more than thirty-six months older than she was.

the circuit court erred in finding the City was liable for the alleged criminal sexual conduct of Clark and Talton.

¶25. Additionally, the City is not liable for Talton's and Clark's sexual contact with Tawanda because there is no evidence that Talton and Clark were acting within the course and scope of their employment when the alleged misconduct occurred. There is no evidence in the record of when and where the alleged sexual activities occurred and there is no evidence that either Talton or Clark was on duty when he engaged in sexual activities with Tawanda.[22] But even if Talton and Clark were on duty when the alleged conduct occurred, Mississippi law is clear that an employee must be acting in furtherance of his employer's business to be considered to be in the course and scope of employment.[23] This Court has stated that, "if an employee steps outside his employer's business for some reason which is not related to his employment, the relationship between the employee and the employer 'is temporarily suspended and this is so "no matter how short the time and the [employer] is not liable for [the employee's] acts during such time.""'[24] Furthermore, "an employee's personal unsanctioned recreational endeavors are beyond the course and scope of employment."[25]

---

[22]Clark met Tawanda when he was moving into an apartment and she was hanging around the apartment building. There is no evidence regarding when he had sexual contact with Tawanda, other than that it occurred sometime before October 2004. Talton first met Tawanda while he was on duty, and he gave her his cell-phone number. There is no evidence that Talton was on duty when he had oral sex with Tawanda at his nephew's house.

[23]*Cockrell v. Pearl River Valley Water Supply Dist.,* 865 So. 2d 357, 361-62 (Miss. 2004) (citations omitted).

[24]*Id.* (quoting *Estate of Brown*, 627 So. 2d at 311).

[25]*Cockrell*, 865 So. 2d at 362.

¶26. As the circuit court found, the purpose of JPD is to protect and serve the citizens of the City of Jackson. There is no question that both Clark and Talton "stepped outside [their] employer's business" for "personal unsanctioned recreational endeavors" at the time they allegedly engaged in illegal sexual contact with Tawanda.[26] Therefore, we find that the circuit court erred in finding Clark and Talton were acting within the course and scope of their employment at the time they engaged in the alleged sexual misconduct.

### The Investigation Concerning the 2004 Allegations

¶27. The circuit court noted that the results of the City's 2004 investigation were unknown, but ultimately found that JPD had failed to fully investigate Tawanda's allegations. Specifically, the circuit court found that JPD had evidence that one of its employees was engaging in sexual contact with Tawanda and had begun an investigation into the allegations, but it failed to complete the investigation due to the lead detective taking medical-disability leave. The circuit court then explicitly recognized that "[t]he manner in which a municipality conducts analysis of basic investigative decisions, including the decision of what type of investigation to conduct, arise from the performance of discretionary functions, of which the City of Jackson has sovereign immunity pursuant to Miss. Code Ann. § 11-46-9(1)(d)."

¶28. The circuit court then concluded that the fact that an investigation was instituted serves as proof that JPD knew criminal activity was being committed by one of its employees. The circuit court ultimately concluded that, had the investigation been

---

[26]*See* **Cockrell**, 865 So. 2d at 362 (finding City was not liable for the employee's misconduct because JPD officer stepped outside course and scope of employment when he attempted to kiss motorist, even though he was within course and scope of employment at time he pulled motorist over).

13

completed, "Tawanda could have received the help she so desperately needed" and that the failure to investigate caused her "to succumb to the brutal and fatal actions of Toice Wilson."

¶29. As stated above, "[a] two-part 'public policy function' test is applied to determine whether conduct is considered a discretionary function subject to immunity."[27] In this case, we are required to determine (1) whether the JPD's decision to investigate or suspend the investigation of Tawanda's 2004 allegations and related failure to discipline Clark involved an element of choice, and, if so, (2) whether the choice involved social, economic, or political policy.

¶30. We have recognized that a police department's decision to investigate and/or discipline an officer involves an element of choice.[28] Neither the Sandifers nor the circuit court points to any authority that would support a finding that the City was *required* to investigate Tawanda's claims or discipline Clark. Additionally, although Mississippi Code Section 21-31-21 contains a series of reasons a police officer can be terminated, "the statute requires the City of Jackson to exercise its judgment in the manner in which it chooses to supervise its officers."[29] We have further recognized that a police department's disciplinary and investigative decisions involve social and public policy, explaining that:

> there is no doubt that the choice to employ and the manner of supervision of police officers does affects [sic] public policy, and the make-up of the police force inherently affects the social policy of a city. The manner in which a police department supervises, disciplines and regulates its police officers is a

---

[27]*Pratt*, 97 So. 3d at 72 (citing *Montgomery*, 80 So. 3d at 795).

[28]*Powell*, 917 So. 2d at 74 (citation omitted).

[29]*Id.*

14

discretionary function of the government and thus the city is immune to suit under [section] 11-46-9(1)(d).[30]

¶31.    Furthermore, the City is not liable for the acts of its employees related to police protection unless the employee acted in reckless disregard of a person's safety.[31]  We have stated that "an inadequate investigation, or a failure to investigate certain acts during the course of an investigation" is "negligence, not reckless disregard."[32]  Thus, assuming *arguendo* that JPD did fail to properly investigate the 2004 allegations, such failure constitutes negligence, for which the City is not liable.

¶32.    We find that the City is immune from liability for JPD's investigation regarding the 2004 allegations, because the investigation was a discretionary function; *i.e.*, the manner in which JPD chose to investigate Tawanda's allegations and to discipline Clark involved an element of choice, and that choice involved social and public policy.  Indeed, the circuit court correctly recognized that the City is immune from liability for its investigative decisions because such decisions are discretionary functions, yet the circuit court then inexplicably found the City was liable for Tawanda's death due to JPD's alleged failure to properly investigate Tawanda's 2004 allegations.  Additionally, an inadequate investigation or failure to investigate does not rise to the level of reckless disregard; rather it constitutes negligence, for which the City is not liable.

---

[30]*Id.*

[31]Miss. Code Ann. § 11-46-9 (Rev. 2012).

[32]*City of Greenville v. Jones*, 925 So. 2d 106, 118 (Miss. 2006), *overruled on other grounds by Joel v. Joel*, 43 So. 3d 424, 437-38 (Miss. 2010).

15

¶33. We find that the circuit court erred in finding the City was liable for JPD's alleged failure to complete an investigation into Tawanda's allegations in 2004 and related failure to discipline Clark before her death.

***Clark's and Talton's Failure to Follow JPD Policies***

¶34. The circuit court found that, even if the City was immune from liability based upon Clark's and Talton's sexual contact with Tawanda because the conduct constituted criminal activities, the officers had a responsibility under the City's policies to determine "whether Tawanda was a minor and whether there was a runaway warrant for her." The circuit court concluded, "[i]t is clear that if Officers Clark and Talton had done what they were supposed to do, Tawanda would not have been out on the streets, and vulnerable to the attack of Toice Wilson;" therefore, the circuit court found that the actions of Clark and Talton contributed to Tawanda's death. Likewise, the Sandifers now argue on appeal that the City's liability does not rest on the sexual acts themselves, but rather rests "on the City's failures to follow its own policies with respect to runaways like Tawanda . . . ."

¶35. The Sandifers additionally argue that JPD policy and general orders required Talton to determine if any adult he encountered had been reported missing if the adult could be mentally incoherent or retarded and also argue that Tawanda met this description at the time Talton met her on the street, because she was crying and upset. However, this policy is based upon an officer's subjective assessment of a person's mental state, and does not require an officer to take every crying individual into custody. Furthermore, the evidence is uncontradicted that Tawanda gave Talton a fake identity, and there is no evidence that he reasonably could have discovered she was a runaway.

16

¶36.    We find no evidence that either Clark or Talton violated JPD policy or general orders by failing to ascertain that Tawanda was a runaway minor and failing to take her into custody.  Although the circuit court found that Clark and Talton had met Tawanda during the scope of their employment and Clark had used his position as a police officer to "give Tawanda the confidence to engage in sexual acts with him," there is no evidence that Clark had any interaction with Tawanda while he was on duty or that he had any reason to suspect she was a runaway.  As to Talton, there is no evidence he knew or should have know that Tawanda was not an eighteen-year-old from Texas named Kaylee until after her death.

¶37.    We have recognized that the Legislature "set an extremely high bar for plaintiffs seeking to recover against a city for a police officer's conduct while engaged in the performance of his or her duties."[33]  The Sandifers have pointed to no authority that would support a finding that Clark's or Talton's alleged violation of JPD general orders or policies would constitute reckless disregard, and this Court has recently rejected such an argument.[34]

¶38.    There is simply no evidence in this case that Clark or Talton knowingly and intentionally committed a wrongful act by failing to take Tawanda into custody or that they exhibited a conscious indifference to consequences, amounting almost to a willingness that harm to Tawanda should follow.  Although Talton did not call into dispatch when he transported Tawanda, there is no evidence that would support a finding that his failure

---

[33]***Presley***, 40 So. 3d at 523.

[34]*See **Presley***, 40 So. 3d at 524 (finding plaintiff and court of appeals cited no authority for the "proposition that a violation of an internal police operating procedure constitutes reckless disregard").

17

amounts to a "willingness that harm should follow" to Tawanda or that Talton would have done anything differently if he had called in the transport.

¶39. We find that the City is immune from liability for the alleged failures of Talton and Clark to follow JPD general orders or policies with respect to Tawanda. The circuit court erred in finding the City liable for Tawanda's death based upon this alleged misconduct.

## CONCLUSION

¶40. For the foregoing reasons, we find that the City is immune from liability for the alleged misconduct of its employees at issue in this case under the Mississippi Tort Claims Act. Therefore, we reverse the judgment of the circuit court and render judgment in favor of the City on the Sandifers' claims.

¶41. **REVERSED AND RENDERED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.**

18