# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CT-00578-SCT

*MISSISSIPPI DEPARTMENT OF WILDLIFE,*
*FISHERIES, AND PARKS*

*v.*

*CANDACE WEBB, THOMAS HARPER, AND*
*KATHLEEN D. WEBB*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 12/02/2014 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| TRIAL COURT ATTORNEYS: | JOE SAM OWEN |
| | STEPHEN G. PERESICH |
| | BRETT K. WILLIAMS |
| | THOMAS M. MATTHEWS, III |
| COURT FROM WHICH APPEALED: | CIRCUIT COURT OF THE SECOND JUDICIAL DISTRICT OF HARRISON COUNTY |
| ATTORNEYS FOR APPELLANT: | STEPHEN G. PERESICH |
| | JOHANNA M. McMULLAN |
| ATTORNEYS FOR APPELLEES: | JOE SAM OWEN |
| | ROBERT P. MYERS, JR. |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE CIRCUIT COURT OF THE SECOND JUDICIAL DISTRICT OF HARRISON COUNTY IS REINSTATED AND AFFIRMED - 03/15/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KITCHENS, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    On August 22, 2009, two officers with the Mississippi Department of Wildlife, Fisheries, and Parks (MDWFP) observed Donald Bernius speeding on the Tchoutacabouffa River in Harrison County, Mississippi. Prior to effecting a stop, the officers ordered Bernius to move his boat to what they contended was a safer location on the river; but Bernius fled in the opposite direction. Bernius's vessel collided with a boat operated by Christopher Webb. The collision killed Webb and seriously injured Shane Webb. Two hours after the collision, Bernius's blood-alcohol content was .25 percent. Kathleen Webb, individually and on behalf of Christopher Webb's wrongful-death beneficiaries, and Candace Webb, as Shane Webb's guardian, filed a lawsuit pursuant to the Mississippi Tort Claims Act (MTCA) against the MDWFP, arguing that the officers had acted in reckless disregard for the safety of others. The Circuit Court of the Second Judicial District of Harrison County, following a bench trial, agreed and ruled in favor of the Webbs. The Mississippi Court of Appeals reversed and rendered a judgment in favor of the MDWFP, finding that the evidence did not demonstrate that the officers had acted with reckless disregard. We granted Candace Webb's Petition for Writ of *Certiorari*. Finding that the Mississippi Court of Appeals misapplied the applicable standard of review and substituted its judgment for that of the trial court, we reverse the judgment of that court and reinstate and affirm the judgment of the Circuit Court of the Second Judicial District of Harrison County.

**FACTS AND PROCEDURAL HISTORY**

¶2.    The following recitation of the facts is repeated from the decision of the Mississippi Court of Appeals:

2

On August 22, 2009, MDWFP conservation officers Barry Delcambre and Michael Thrash witnessed Donald Bernius speeding in a boat on the Tchoutacabouffa River. The officers each navigated their separate patrol boats into the river to investigate and stop Bernius. Bernius saw the officers and came to an initial stop in the middle of the river.

According to the officers' testimony at trial, they recognized that their boats and Bernius's boat were stopped in a "dangerous area" of the river. The officers testified that this particular area of the river, known as Bend 2, has blind spots where boaters heading from either direction cannot see other boaters approaching from the opposite direction. The officers explained that, as a result of stopping and approaching Bernius, the three boats were situated in a position so as to occupy most of the width of the river, which, according to the officers, created an eminent [sic] hazard for other boaters. As a result, Officer Delcambre instructed Officer Thrash to have Bernius move to the nearby straightaway down the river to provide a safer location for them to question Bernius. Officer Delcambre proceeded ahead of Officer Thrash and Bernius with the intention of blocking oncoming traffic.

Officer Thrash ordered Bernius to follow them out of Bend 2 into the straightaway, and Bernius agreed to comply with the instructions. Officer Thrash then proceeded to the straightaway after Officer Delcambre so that Bernius could follow him. According to Officer Thrash, Bernius followed him a short distance, and then Bernius abruptly turned his vessel 180 degrees and fled in the opposite direction. Officer Thrash then signaled to Officer Delcambre, and the officers pursued Bernius.

At the same time, John Joachim was traveling down the river in his boat in the opposite direction from Bernius. Joachim provided in his statement that he observed Bernius speeding and recklessly driving on the wrong side of the river. As Bernius's boat approached, Joachim had to use evasive maneuvers to avoid a collision with Bernius. After passing Joachim's boat, Bernius collided with a boat operated by Christopher [Webb]. The collision resulted in Christopher [Webb's] death and injuries to Shane [Webb], who was a passenger in Christopher [Webb's] boat.

Neither Officer Delcambre nor Officer Thrash witnessed the collision. Once the officers arrived at the scene of the accident, they began rescue procedures, tended to the injured, alerted authorities, and assisted Bernius out of the water. Bernius was treated at Biloxi Regional Medical Center. Approximately two hours after the accident, a blood sample was drawn from Bernius, which indicated a .25 percent blood-alcohol concentration (BAC) level. Bernius later

pled guilty to boating under the influence (BUI) and causing death and injury. Bernius is currently serving a twenty-year sentence in prison. As the record reflects, prior to the incident, Bernius was a paraplegic and wheelchair bound.

In connection with the boating accident, the Mississippi Department of Marine Resources (MDMR) investigated Officer Delcambre's and Officer Thrash's conduct. After interviewing Officer Delcambre and listening to an interview of [Dexter] Bouie, the passenger in Bernius's boat, the MDMR determined that Officers Delcambre and Thrash "acted completely within the scope of their duties . . . ." The MDMR concluded "that the only people responsible for this boating accident were the people involved in the actual accident." The Webbs subsequently filed suit against the MDWFP under the MTCA, claiming that Officers Delcambre and Thrash acted with reckless disregard for the safety of others when they failed to detain Bernius and instructed him to move to a safer location.

At a bench trial held on February 18 and 19, 2014, Officers Delcambre and Thrash testified to their knowledge and understanding of the MDWFP's Standard Operation Procedures (SOPs) for handling BUI situations. Both officers testified that, in their initial contact with Bernius, his demeanor and handling of his vessel, among other things, failed to indicate he was impaired. Officer Thrash specifically testified that, at the time, he had no reasonable suspicion to believe Bernius was intoxicated.

Officers Delcambre and Thrash testified that their first priority during their initial contact with Bernius was to ensure the safety of other boaters and citizens on the river. Officer Delcambre explained, "On that particular day[,] due to the river traffic and the fluctuations of the traffic coming north and south up the river where we encountered Bernius there in [B]end [2], due to the nature of where we [were] . . . I made the judgment to move around the bend for the safety of the people and everybody involved on the river."

. . .

The circuit court ultimately held that, "considering the totality of the circumstances and the applicable law, as well as the admissions of the officers, the officers acted in this case with reckless disregard." . . . The circuit court explained:

> [The officers] did not exercise any of the care or consideration
> [that] they were required to do in their dealings with Bernius.
> They clearly intended that Bernius continue to operate his boat

4

without any restrictions from them and without their having made any inquiries as to his reckless operation, speeding, physical abilities, or use of alcoholic beverages. They "intended to do the act that caused harm to come to the [p]laintiff."

The circuit court ultimately rendered a judgment for the Webbs. The circuit court conducted a damages hearing on November 5, 2014, and awarded damages in the amount of $1,400,000 to the guardianship of Shane, and damages of $100,000 to Kathleen, individually and on behalf of Christopher's wrongful-death beneficiaries. After applying the MTCA's statutory cap on damages, the circuit court ultimately entered a final judgment to the guardianship of Shane in the amount of $466,666.67, and to Kathleen, individually and on behalf of Christopher's wrongful-death beneficiaries, in the amount of $33,333.33.

*Miss. Dep't of Wildlife, Fisheries, and Parks v. Webb*, 2017 WL 1396686, **2-4 (Miss. Ct. App. Apr. 18, 2017).

¶3.     The Mississippi Court of Appeals held that "the circuit court's judgment lacks credible and substantial evidentiary support." *Id.* at *11. The court continued: "[t]he evidence failed to show that the officers' conduct 'evinced not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that high risk and the high probability of harm involved.'" *Id.* (quoting *Bradley v. McAllister*, 929 So. 2d 377, 380 (Miss. Ct. App. 2006)).

## STANDARD OF REVIEW

¶4.     The applicable standard of review follows:

"A circuit court judge sitting without a jury is afforded the same deference as a chancellor." *City of Jackson v. Sandifer*, 107 So. 3d 978, 983 (Miss. 2013) (citing *City of Jackson v. Powell*, 917 So. 2d 59, 68 (Miss. 2005)). This Court leaves undisturbed a circuit court's findings following a bench trial unless the findings "are manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Sandifer*, 107 So. 3d at 983 (quoting *Powell*, 917 So. 2d at 68). The circuit court's findings "are safe on appeal where they are

5

supported by substantial, credible, and reasonable evidence." *City of Jackson v. Law*, 65 So. 3d 821, 827 (Miss. 2011) (quoting *City of Ellisville v. Richardson*, 913 So. 2d 973, 977 (Miss. 2005)). "Although reasonable minds might differ on the conclusion of whether or not the officer in question acted in reckless disregard, it is beyond this Court's power to disturb the findings of the trial judge if supported by substantial evidence." *Richardson*, 913 So. 2d at 978 (citing *City of Jackson v. Brister*, 838 So. 2d 274, 277-78 (Miss. 2003)).

*City of Jackson v. Lewis*, 153 So. 3d 689, 694 (Miss. 2014). "In a bench trial, when the trial judge sits as the finder of fact, he [or she] has the sole authority for determining the credibility of witnesses." *Brister*, 838 So. 2d at 279 (citing *Yarbrough v. Camphor*, 645 So. 2d 867, 869 (Miss. 1994)).

## DISCUSSION

¶5.     The Mississippi Tort Claims Act insulates employees of a governmental entity, "acting within the course and scope of their employment," from liability for any claim while that employee is "engaged in the performance or execution of duties or activities relating to police . . . protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury . . . ." Miss. Code Ann. § 11-46-9(1)(c) (Rev. 2012).

¶6.     This Court has held that "'[r]eckless disregard' . . . denotes 'more than mere negligence, but less than an intentional act.'" *Lewis*, 153 So. 3d at 693 (quoting *Law*, 65 So. 3d at 826). "'Our case law indicates "reckless disregard" embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act.'" *Miss. Dep't of Pub. Safety v. Durn*, 861 So. 2d 990, 995 (Miss. 2003) (quoting *City of Jackson v. Lipsey*, 834 So. 2d 687, 692 (Miss. 2003)). Moreover, "'reckless disregard usually is accompanied

6

by a conscious indifference to consequences, amounting almost to a willingness that harm should follow.'" ***Durn***, 861 So. 2d at 995 (quoting ***Maye v. Pearl River Cty.***, 758 So. 2d 391, 394 (Miss. 1999)). Reckless disregard occurs "when the 'conduct involved evinced not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved.'" ***Durn***, 861 So. 2d at 995 (quoting ***Maldonado v. Kelly***, 768 So. 2d 906, 910-11 (Miss. 2000)).

¶7. The Alcohol Boating Safety Act provides: "It is unlawful for any person to operate a watercraft on the public waters of this state who . . . [i]s under the influence of intoxicating liquor . . . ." Miss. Code Ann. § 59-23-7(1)(a) (Rev. 2013). Mississippi Code Section 59-21-83 provides that:

> No vessel shall be operated within this state in a reckless or negligent manner or at a rate of speed greater than is reasonable and prudent under the then existing circumstances or when the operator is so physically or mentally incapacitated as to be incapable of safely operating such vessel, or while the operator is under the influence of intoxicating liquor or narcotics . . . .

Miss. Code Ann. § 59-21-83 (Rev. 2013).

¶8. The Mississippi Department of Wildlife, Fisheries, and Parks issued Standard Operating Procedures (SOPs) for enforcing the Alcohol Boating Safety Act on February 20, 2006, which were to "[s]upersede[] all prior departmental [d]irectives on this subject." SOP 04.01 requires custodial arrests for "[v]iolations of the Alcohol Boating Safety Act" and provides that for other violations, "a citation should be issued at the scene . . . ." SOP 04.01, in the case of a custodial arrest, sets forth procedures for the officers to undertake in securing the vessel.

¶9.    SOP 07/03 states that, in order "to establish probable cause, an Officer must . . .

[h]ave a reasonable belief that an operator of a watercraft is under the influence; and . . .

[m]eticulously follow the procedures necessary to form probable cause, to establish probable

cause, and/or prima facie intoxication." (Emphasis in original.) The SOP 07/03 continues:

> Since BUI applies to operators of watercraft, which are underway, this will mean that the effort to establish probable cause for BUI will begin after an Officer's stopping of a watercraft, which is underway.
>
> Generally, for an Officer to stop a vessel that is underway, you must have observed that vessel being operated in a negligent or reckless manner, or observe the vessel or its operator in violation of some other law or regulation (i.e. too many occupants in the boat, improper [personal flotation devices], etc.)[.] However, an Officer may stop a boat for a routine safety check and then for a reasonable belief that the operator might be under the influence which begins the process for establishing probable cause for BUI[.]
>
> NOTE: An Officer may not use a safety check as an excuse to stop any watercraft for the sole purpose of attempting to establish probable cause for BUI.
>
> Once a vessel has been stopped, the Officer may then ascertain if there is further probable cause to suspect that the operator or the vehicle is under the influence of alcohol, drugs, or a controlled substance. Evidence to warrant proceeding to the screening/intoxication interview include:
>
> > 1.    Slurred speech;
> >
> > 2.    Poor balance (not as convincing on water due to wave action);
> >
> > 3.    Bloodshot eyes; and
> >
> > 4.    Other behavioral anomalies that suggest the individual is not in complete control of his or her faculties.

(Emphases in original.)

¶10.    The trial court ruled that, while "both officers stated that they were going to move into the straightaway and then determine why Bernius had been reckless and speeding and then go into the BUI format," neither officer pointed to anything "(statute, SOP, rule, case law, etc.) which would indicate that this was an acceptable or permissible procedure." The trial court ruled:

> In this case, SOP 4.01 provides that citations are to be issued "at the scene." That SOP does not provide that the officers may direct the offending operator to continue to operate his vessel prior to issuing a citation. Specifically, it does not provide for directing an operator to move his vessel to another location. Movement of the boat is permitted only on a custodial arrest and then that movement is not made by the offending operator. SOP 07/03 defines "probable cause" and states that "the effort to establish probable cause for BUI will begin after an Officer's stopping of a watercraft . . . ." The word "will" is mandatory, not permissive. SOP 07/03 then provides that after stopping a vessel, "the Officer may then ascertain if there is further probable cause . . ." and gives a list of evidence to consider to determine whether to proceed to "the screening/intoxication interview . . . ." These provisions indicate that the officer is required upon stopping a vessel to begin his efforts to establish probable cause for BUI and that the officer may determine that there is further probable cause  by considering the four (4) factors listed. If those four (4) factors exist, the officer then must proceed to the screening interview.

The trial court continued that Officers Thrash and Delcambre "decided without hesitation to direct Bernius to continue to operate his boat to travel to the straightaway before either determining why Bernius was reckless and speeding or whether the use of alcohol could be ruled out."

¶11.    The Court of Appeals disagreed with the trial court's interpretation of the SOPs, concluding that, "due to public interest in the officers' safety when conducting a stop, we find that the officers here possessed the discretion to request that Bernius pull out of the hazardous and high-traffic area of the river." We cannot agree with the conclusion of the

9

Court of Appeals because the trial court's interpretation of the MDWFP's SOPs was not manifestly wrong, clearly erroneous, and it did not demonstrate the application of an erroneous legal standard. The Court of Appeals may have disagreed with the trial court's conclusions. But, with respect, that is not enough to reverse the trial court's judgment.

¶12.    The Court of Appeals correctly observed that "Mississippi precedent establishes that a violation of a SOP does not alone establish reckless disregard." *Webb*, 2017 WL 1396686, *9 (citing *City of Jackson v. Presley*, 40 So. 3d 520, 524 (Miss. 2010)).[1] Trial courts must "'look to the totality of the circumstances when analyzing whether someone acted in reckless disregard.'" *Lewis*, 153 So. 3d at 694 (quoting *Richardson*, 913 So. 2d at 977).

¶13.    The appeals court found that "Officer Thrash admitted that, during the alleged stop, he did not ask Bernius or his passenger whether they had consumed," but that "he could not tell if Bernius's speech was slurred because he only heard Bernius say 'Okay' in response to the command for Bernius to follow the officers to the straightaway." *Webb*, 2017 WL 1396686, *6. Moreover, Officer Thrash testified that he did not have reasonable suspicion that Bernius was under the influence: "Bernius 'was seated on his boat and appeared to have good posture,' and [Officer Thrash] was never close enough to Bernius to observe if his eyes

---

[1] The trial court observed that "[t]his case . . . is not a pursuit case . . . and no party suggests that the Court should review or consider the ten (10) pursuit factors." *See Lewis*, 153 So. 3d at 694). According to the trial court, "[t]he actual pursuit in this case had ended when Bernius stopped before Bend 2. He was then being detained by Thrash and Delcambre and was under their direction and control. When [Bernius] turned around and sped away, neither Thrash nor Delcambre was in pursuit." The trial court continued: "[t]he parties agree that the Court is to consider the totality of the circumstances in arriving at a determination of whether there is reckless disregard in this matter."

10

were bloodshot. . . . Bernius exhibited no behavior anomalies suggesting that Bernius was not in complete control of his faculties." *Id.* The Court of Appeals continued:

> Officer Delcambre testified that, because of the blindspot located in the bend where he and Officer Thrash stopped Bernius, he was not close enough to Bernius's boat to be able to assess Bernius's mental, physical, or sensory faculties. Officer Delcambre explained, "We never engaged [Bernius] in slurred speech. I never engaged him in a conversation. I never engaged him in any of that. My main objective at the point where we made contact was to get him out of the bend of the river." Officer Delcambre instructed Officer Thrash to tell Bernius to follow the officers around the bend so they could safely question Bernius regarding his excessive speeding and reckless operation of the boat.

*Id.* at 7. Both Officers Thrash and Delcambre testified that a "blind spot" existed in the bend of the river where Bernius was stopped. In analyzing the totality of the circumstances, the Court of Appeals relied solely on the testimony of Officers Thrash and Delcambre. But it ignored the determination by the trial court that the testimony of Officers Thrash and Delcambre lacked credibility. "In a bench trial, when the trial judge sits as the finder of fact, [s]he has the sole authority for determining the credibility of witnesses." *Brister*, 838 So. 2d at 279 (citing *Yarbrough*, 645 So. 2d at 869).

¶14.   Officer Keith Lewis Bond, a conservation officer with the MDWFP, prepared a report following the accident which was submitted to the district attorney. He stated in that report that Officers Thrash and Delcambre had, prior to stopping Bernius, "initiated blue lights and siren in an attempt to stop Bernius as he passed falling in behind him southbound as he ignored their signals." Both Officers Thrash and Delcambre attempted to discredit this report during the bench trial. Officer Thrash stated that "when [Bernius] saw me he decelerated his boat and began to stop. So in my opinion he did not ignore my blue lights and sirens." Officer

11

Delcambre testified that the sentence in the report indicating that Bernius had ignored the blue lights and siren was not correct. The trial court found that "[t]he officers pursued Bernius down the straightaway between Bends 3 and 4, around [B]end 3, and eventually got Bernius stopped just before Bend 2."

¶15. Joshua Lord, who was boating on August 22, 2009, helped Officers Thrash and Delcambre in getting Bernius to shore and in searching in the water for the deceased victim. Lord testified, without objection, that he had heard Officer Delcambre state to other MDWFP officers that Officer Delcambre had "stop[ped] the boat because his passenger was propped up on his back holding him up keeping him able to drive." Officer Delcambre, during the bench trial, denied that he had told anyone that he had observed Bernius being propped up in the boat by his passenger, Dexter Bouie.

¶16. The accident occurred at 4:15 p.m. (16:15) and Bernius's blood was drawn at 6:30 p.m. (18:30), two hours and fifteen minutes later. The report from the Mississippi Crime Laboratory indicates that Bernius's blood-alcohol content was .25%. Both Officers Thrash and Delcambre agreed that "an individual with a .25 BAC has severe impairment of all mental, physical and sensory function." Officer Delcambre stated that a person with such impairment "couldn't stand up, couldn't articulate, you know, in speech, could mean no hand or eye coordination."

¶17. The trial court stated that "the fact that Bernius was ultimately determined to have a BAC of .25% does not mean that the officers knew or should have known of that at the time they stopped Bernius," but that such determination does "call into question the officers'

12

observations (or lack thereof) of Bernius." The trial court mentioned Officer Delcambre's testimony "that a BAC of .25% is a severe impairment and that a person with that BAC is unable to stand, cannot articulate, and has no hand/eye coordination." The court continued: "[i]t raises a question in the Court's mind about the accuracy of the officers' observations of Bernius or perhaps the accuracy of their testimony." The court found that Lord's testimony that, "after the accident, he heard Delcambre tell other officers that they stopped Bernius because the passenger was propping Bernius up and that the two men were back to back," called into question the veracity of Officer Delcambre's testimony denying having said that.

¶18. Officer Bond's report also stated that Officer Delcambre and Lord "stated that they could smell the distinct odor of an intoxicating beverage on Bernius's breath" as the pair of them extracted the paraplegic (Bernius) from the water and into Officer Delcambre's boat following the accident. Lord testified at the bench trial that "the smell was very strong coming off of [Bernius's] breath of alcohol." Officer Delcambre testified at the bench trial "[i]t's false" in reference to the MDWFP report prepared by Officer Bond. Lord described Bernius's behavior as, "[i]n one word, wasted." The trial court found that Lord's testimony was credible, noting that "Lord is not affiliated with any party in this case and did not know either Bernius or Delcambre." The trial court continued that "[t]here was no plausible reason, in fact, no reason at all given as to why Lord's testimony should be questioned concerning this statement."

¶19. Officer Thrash testified that, when he and Officer Thrash began the process of getting Bernius to stop his boat, "at the time we were in that dangerous bend and we needed to get

out of that dangerous bend to a long straightaway, and at that time we would have conducted an interview, but at that time he [gave] us no reasonable suspicion to believe that he had been drinking." Officer Thrash then agreed that he and Officer Delcambre had stopped Bernius not only to "determine why he was driving recklessly" but also "to rule out the use of alcohol . . . ." Officer Delcambre testified that "we had at least two-thirds of the river blocked and in a dangerous bend and the blind spot. So if somebody had come around from that straightaway and around that [blind spot] right there one of the three boats more than likely would have been hit." The trial court found that "the only evidence that Bend 2 was really either blind or dangerous is the testimony of Thrash and Delcambre" and that such testimony amounted to nothing more than "well-rehearsed mantra." The court further questioned the veracity of the officers' testimony by pointing out that:

> [i]f these officers really believed that Bend 2 was a blind, dangerous curve and was as dangerous as they would like for this Court to believe, they cannot truly believe that it was safe or reasonable to order an acknowledged reckless operator to drive his boat through that dangerous area unfettered in any manner.

According to the trial court, "[t]he photographs do show a sharp curve as Bend 2, but the points of reference in the photographs do not lend themselves to any real assessment that Bend 2 is a blind curve or a dangerous curve."

¶20.    Officer Thrash testified that it was impossible to have moved Bernius's boat to or near a pier close in proximity to the place at which Bernius's boat had been stopped in Bend 2 because if "you have two boats side by side and a boat comes by you at full speed the wake action could actually break your arm or fingers . . . while you're sitting there trying to

conduct an interview." He stated, however, that the danger of a collision due to the blind curve of Bend 2 would have been avoided entirely by moving the boats to or close to the nearby pier. The trial court found that Thrash's testimony concerning the possibility that an arm or finger could be broken due to the wake of passing boats was "not credible." The trial court observed that "these officers are experienced enough to avoid breaking a finger simply because a boat is docked at a pier." She continued: "[t]hese are experienced officers who dock boats every day. They were both, in fact, at a pier or dock when they first saw Bernius and yet there is no report of any finger breaking incident occurring there."

¶21. We cannot discard the trial court's finding that the testimony of Officers Thrash and Delcambre was not credible because substantial, credible, and reasonable evidence in the record contradicts the officers' testimony. The trial court ultimately found that:

> [w]hether the officers knew that Bernius was intoxicated or not and whether they should have known or not, Thrash and Delcambre admittedly appreciated the unreasonable risk to others on the River in allowing a person to recklessly operate a boat and/or to operate at an unreasonable speed. They acknowledged that there was a probability of harm to others if they permitted such a person to operate a boat in that manner. Yet they not only permitted Bernius to continue to operate his boat, they directed him to do so.

In reversing and rendering the trial court's judgment, the Court of Appeals ignored substantial, credible, and reasonable evidence adduced in the bench trial which supported the trial court's finding that Officers Thrash and Delcambre acted with reckless disregard for the safety of others.

15

# CONCLUSION

¶22.    It is possible that reasonable minds could differ on the question of whether Officers Thrash and Delcambre acted in reckless disregard for the safety of others. But, despite substantial evidence adduced at trial supporting the thorough finding by the Circuit Court of the Second Judicial District of Harrison County that Officers Thrash and Delcambre acted in reckless disregard for the safety of others, the Mississippi Court of Appeals disagreed with the court's conclusion and substituted its own findings of fact. Accordingly, we reverse the judgment of the Mississippi Court of Appeals and reinstate and affirm the judgment of the Circuit Court of the Second Judicial District of Harrison County.

¶23.    **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE CIRCUIT COURT OF THE SECOND JUDICIAL DISTRICT OF HARRISON COUNTY IS REINSTATED AND AFFIRMED.**

**WALLER, C.J., RANDOLPH, P.J., KING, BEAM AND CHAMBERLIN, JJ., CONCUR. MAXWELL, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION. ISHEE, J., NOT PARTICIPATING.**

**COLEMAN, JUSTICE, DISSENTING:**

¶24.    The plaintiffs bore the burden of producing evidence that the law enforcement officers in the case *sub judice* acted with reckless disregard. Even in light of our highly deferential standard of review, the plaintiffs failed to produce evidence that the officers in question appreciated the risk of the suspect fleeing or consciously disregarded any risk. A review of the trial court's order indicates that the trial judge based her judgment in favor of the plaintiffs on a rejection of the defenses offered by the Department rather than sufficient, affirmative proof offered by the plaintiffs to show reckless disregard on the part of the

16

officers. In doing so, the trial court erred by reversing the burden of production. Accordingly, the trial court erred in granting judgment in favor of the plaintiffs, and I, with respect, dissent.

**Standard of Review**

¶25. "A circuit court judge sitting without a jury is afforded the same deference as a chancellor." *City of Jackson v. Lewis*, 153 So. 3d 689, 693 (¶4) (Miss. 2014). Accordingly, we will not disturb a circuit court's findings following a bench trial where the findings are supported by substantial, credible, and reasonable evidence. *Id.* However, we must reverse the circuit court's findings where they are manifestly wrong or clearly erroneous, or the court applied an erroneous legal standard. *Id.* "Although reasonable minds might differ on the conclusion of whether or not the officer in question acted in reckless disregard, it is beyond this Court's power to disturb the findings of the trial judge if supported by substantial evidence." *Id.* (citing *City of Ellisville v. Richardson*, 913 So. 2d 973, 978 (¶15) (Miss. 2005)). We review questions of law de novo. *Richardson*, 913 So. 2d at 977 (¶13).

**Analysis**

¶26. The plaintiffs bore the burden of proving that Officers Delcambre and Thrash acted with reckless disregard. *Hinds County v. Burton*, 187 So. 3d 1016, 1022 (¶17) (Miss. 2016). Therefore, the plaintiffs had to prove, by a preponderance of the evidence, both that the officers appreciated the risk of the suspect fleeing the scene and causing another accident and that they deliberately disregarded the risk and "high probability" of harm resulting therefrom.

17

*City of Jackson v. Lewis*, 153 So. 3d 689, 693-694 (¶5) (Miss. 2014). In short, plaintiffs failed to produce sufficient evidence to prove their claim.

¶27. Plaintiffs, in their case-in-chief, called four witnesses: Officer Thrash, Officer Delcambre, Master Sergeant Keith Bond of the Department of Wildlife, Fisheries, and Parks, and Joshua Lord. Of the four, only Officers Thrash and Delcambre had personal knowledge of the events surrounding the stop of Bernius and the factors that weighed in the decision of the officers to order Bernius to follow them to a straightaway in the river. Master Sergeant Bond testified about the contents of the report of the accident prepared by the Department, and Lord witnessed the aftermath of the underlying collision. Via none of the witnesses did the plaintiffs produce evidence that Officers Thrash and Delcambre acted with reckless disregard as the phrase is defined above.

¶28. Without question, at the time of the underlying incident, Officer Thrash was less experienced. The stop of Bernius was the first time he participated in stopping a boater for what turned out to be boating under the influence. Officer Thrash acknowledged that Bernius operated the boat prior to the initial stop in a manner which indicated a lack of control and recklessness. He denied knowing at the time of the stop that Bernius's blood alcohol level was elevated. After the initial stop, when Thrash pulled his boat up next to Bernius's, Bernius appeared to have good posture and did not speak in a way that Thrash could appreciate that he was slurring words. Officer Thrash testified that, other than the initial manner described above in which Bernius operated his boat coming around the river bend, he observed no signs or "behavioral anomalies" indicating Bernius did not have control

18

of his faculties. Regarding the decision to order Bernius to follow the officers out of the river bend and to a straightaway, Thrash testified as follows:

> Well, at the time we were in that dangerous bend and we needed to get out of that dangerous bend to a long straightaway, and at that time we would have conducted an interview, but at that time he gave us no reasonable suspicion to believe that he had been drinking.

Officer Thrash consistently denied that, at the time he ordered Bernius to follow, he had reasonable suspicion that Bernius had been drinking. He testified that, had Bernius not attempted to flee, he and Officer Delcambre would have questioned him and, if during questioning, he had exhibited signs of having consumed alcohol, investigated accordingly. Officer Thrash testified that he had made other stops for reckless operation and found that the boat operator had consumed no alcohol.

¶29. The testimony of Officer Delcambre resembled that of Officer Thrash. Officer Delcambre agreed that Bernius sped and operated his boat in a reckless manner before the stop. Officer Delcambre confirmed that the initial stop was very brief, about fifteen seconds, and that the boats never came to a complete halt but continued to move at "idle speed." Officer Delcambre did not interact with Bernius, but he did instruct Officer Thrash to order Bernius out of the bend and into a straightaway. Officer Delcambre steadfastly testified that at the time of the very brief stop, the stop was occasioned by Bernius's reckless operation of his craft and that no reasonable suspicion of boating under the influence of alcohol arose.

¶30. The trial judge's opinion characterized the Department's defense as resting "solely on their position that the boats were stopped in a dangerous bend of the River, that they were blocking a portion of the River. . . ." The trial judge rejected the defense as not credible. She

19

did not believe Officers Thrash's and Delcambre's testimony that the bend in the river was a dangerous place to stop. Of course, as the finder of fact, the trial judge is the arbiter of witness credibility. However, the plaintiff bore the burden of proof, **Hinds County v. Burton**, 187 So. 3d 1016, 1022 (¶17) (Miss. 2016), not the Department. It is not enough that the trial court rejected what it viewed as the sole defense of the Department. The plaintiff must offer evidence that shows the officers acted with reckless disregard.

¶31. The trial judge relied heavily on the undisputed fact that Bernius's blood alcohol content later was determined to be .25 percent, but neither Officer Thrash nor Officer Delcambre knew at the time of the stop what his blood alcohol level later would prove to be. Officer Thrash testified that Bernius sat upright and with good posture. The plaintiffs failed to produce any evidence that the officers had reason to believe Bernius was intoxicated at the time of the stop. Nowhere in the record is evidence by the plaintiffs that shows either officer directed Bernius to continue operating his boat despite reaching a belief that Bernius was intoxicated. Accordingly, the Department's operating procedures, upon which the plaintiffs rely as evidence of reckless disregard, do not support the verdict, because it is undisputed that the officers never formed a reasonable suspicion that Bernius was intoxicated until well after the stop. The finding of the trial judge that the Department did not contest that its officers had failed to follow the operating procedures lacks evidentiary support. Both officers testified consistently that, because they had no reasonable suspicion that Bernius was intoxicated, the operating procedures governing boating under the influence never came into play.

¶32.    The trial judge faults the officers for allowing Bernius to continue to operate his boat in order to move into a straightaway. However, in the absence of evidence that the officers had reason to believe Bernius was intoxicated, in my opinion, such a decision does not constitute reckless disregard, which would require that the officers appreciated the risk of Bernius again operating his boat recklessly and that they acted in disregard of that risk. *City of Jackson v. Lewis*, 153 So. 3d 689, 693-694 (¶5) (Miss. 2014). The facts of the case *sub judice* can be contrasted with those of *Turner v. City of Ruleville*, 735 So. 2d 226 (Miss. 1999). There, the plaintiff alleged that a police officer had failed to stop an obviously intoxicated driver from driving. *Id.* at 227 (¶ 2). The trial court granted the city's motion under Mississippi Rule of Civil Procedure 12(b)(6) to dismiss, but the Supreme Court reversed. We wrote, "[T]he facts pled do allege that he wrongfully and intentionally allowed a visibly intoxicated Smith to continue driving. By this alleged act, the officer allegedly showed a reckless or wanton or willful disregard for the safety of other drivers on the road, including Turner." *Id.* at 230 (¶ 19). In today's case, sufficient evidence did not exist to support a finding that Bernius was visibly intoxicated at the time of the initial stop. Where in *Turner*, the trial court erred in dismissing the complaint because the plaintiff had alleged that the officer knew of the risk of the driver's intoxication and allowed him to drive anyway, in the case *sub judice* there is no evidence that the officers acted in similar disregard of a known risk. *Lewis*, 153 So. 3d at 693-694 (¶5).

¶33.    Also persuasive is the reasoning of the Mississippi Court of Appeals in *Thomas v. Mississippi Department of Public Safety*, 882 So. 2d 789 (Miss. Ct. App. 2004). In

***Thomas***, a highway patrolman stopped a driver for speeding and issued a speeding ticket. *Id.* at 791 (¶ 3). After the stop, the driver drove eight miles and wrecked his van; the wreck fatally injured the driver's son. *Id.* at 791 (¶ 4). The decedent's wrongful-death heirs filed suit against the Department of Public Safety, contending that the failure of the patrolman to check the driver for driving under the influence caused the accident. *Id.* at 791 (¶ 7). Although three witnesses at the scene of the wreck testified that they smelled alcohol on the driver's breath, the highway patrolman who performed the stop denied smelling alcohol on the driver at the time of the stop. *Id.* at 791 (¶¶ 3, 5). The trial court found that the patrolman's actions did not rise to the level of reckless disregard, and the Court of Appeals affirmed. The Court of Appeals reasoned, in part, as follows:

> There was evidence in phase one of the DUI detection process that suggests that Mr. Thomas was sober. When Officer Johnson pursued Mr. Thomas, he noted that a proper turn signal for a left turn was executed. Officer Johnson also observed Mr. Thomas properly turn into Mrs. Montgomery's residence and safely stop. When Mr. Thomas drove on the road leading to Mrs. Montgomery's residence, his speed was forty to forty-five miles per hour, not an excessive speed. Officer Johnson testified that evading an arrest is not necessarily an indication of intoxication. He also testified that in his sixteen years as a highway patrolman he has stopped numerous people for speeding who are not under the influence and that he should look at other things before deciding that a driver might be intoxicated.

*Id.* at 795 (¶ 19). The facts upon which the Court of Appeals relied are similar to the facts of the case *sub judice*. In today's case, the officers testified that boaters who are sober regularly are stopped for reckless boating, and they both testified that they did not observe any signs that Bernius was intoxicated during the brief stop.

¶34. For the foregoing reasons, the plaintiffs' proof at trial did not suffice to show that Officers Thrash and Delcambre acted with reckless disregard when they instructed Bernius to follow them to a different part of the river. I would reverse the trial court's judgment against the Department of Wildlife, Fisheries, and Parks.