# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01364-COA

DANNY TOWNS                                                              APPELLANT

v.

PANOLA COUNTY BOARD OF SUPERVISORS                      APPELLEES
AND PANOLA COUNTY, MISSISSIPPI

DATE OF JUDGMENT:               11/10/2020
TRIAL JUDGE:                    HON. JAMES McCLURE III
COURT FROM WHICH APPEALED:      PANOLA COUNTY CIRCUIT COURT,
                                SECOND JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT:        DEREK OLIVER FAIRCHILDS
                                GLENN K. VINES JR.
ATTORNEYS FOR APPELLEES:        ARNULFO URSUA LUCIANO
                                DANIEL JUDSON GRIFFITH
                                BETHANY ANN TARPLEY
NATURE OF THE CASE:             CIVIL - PERSONAL INJURY
DISPOSITION:                    REVERSED AND REMANDED - 06/28/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.

### WESTBROOKS, J., FOR THE COURT:

¶1.     Danny Towns appeals a bench trial verdict in favor of the Panola County Board of

Supervisors and Panola County (collectively Panola County) after seriously injuring himself

by driving into a washed-out culvert on a Panola County road during a severe storm.  The

trial court found Panola County was entitled to the "premises immunity" and "weather

immunity" under the Mississippi Tort Claims Act (MTCA).  Towns argues that the trial court

erred in finding that Panola County did not have notice of the dangerous condition when

analyzing the case under the MTCA immunities and erred when finding the storm was the

sole cause of the culvert failure. He also asserts that the trial court did not base its findings that a downed tree contributed to the culvert's failure on substantial credible evidence.[1] We find that the trial court erred in finding that exemptions applied to shield Panola County from liability under the MTCA, and therefore we reverse and remand for proceedings consistent with this opinion.

### FACTS AND PROCEDURAL HISTORY

¶2. In the early morning hours of April 25, 2015, Danny Towns and his co-workers were driving home on Mount Olivet Road after an after-work gathering with friends. As he drove on to drop off his final passenger at approximately 2:00 a.m., he found himself navigating through a very heavy rain storm. Towns was not aware that the culvert under the road, formed of a round metal pipe approximately five feet in diameter and fifty-five feet long, had washed out during the rainstorm and left a deep ravine in the road. It is undisputed that Towns drove a truck into the washed-out culvert on this road, injuring himself and killing his passenger James Harris.[2] Towns left the scene of the accident on foot but returned after the arrival of first responders approximately half an hour later. He was described as being "highly in shock." Deputy Darryl House from the Panola County Sheriff's Department, one

---

[1] Because we remand, we need not address Towns' additional assertion that the trial court abused its discretion in allowing hearsay and other testimony of storm damage into evidence.

[2] Testimony conflicts on whether the road crumbled underneath Towns as he drove over it, or whether the hole was present before Towns drove into it. This conflict is not pertinent to the question at issue on appeal because the "open and obvious" defense was not part of the trial court's analysis that the state was immune under Mississippi Code Annotated section 11-46-9(1)(v) (Rev. 2014) (premises immunity).

of the first to arrive on the scene, testified that the vehicle was positioned face down in the culvert in about three or four feet of water. House also noted the presence of drugs and beer cans in the truck.[3] Towns was taken to Tri-Lakes Hospital from the scene and later moved to "The Med," where he was treated for internal bleeding, a broken jaw, and broken ribs. He eventually received two surgeries for a broken leg and ankle. Towns claims to have no recollection of what occurred after the truck began to fall into the ravine; his next memory after falling was waking up in the hospital.

## I. Testimony Regarding Culvert Deterioration

¶3. In April 2016, Towns filed a complaint pursuant to the MTCA, Miss. Code Ann. § 11-46-9 (Rev. 2014). He alleged that the culvert was in a serious state of deterioration and disrepair and that Panola County was aware of this condition. Towns asserted that this deterioration, in addition to the heavy rain, was the cause of the washout that led to his accident. Panola County, in its June 2016 answer, claimed immunity based on eleven statutory exemptions from liability under the MTCA, which Panola County later amended to three: (1) discretionary-function immunity, *id*. § 11-46-9(1)(d); (2) weather immunity, *id*. § 11-46-9(1)(q); and (3) premises immunity, *id*. § 11-46-9(1)(v). A bench trial took place in October 2020.

### A. Tommy Austin

¶4. The ensuing interrogatory responses from Panola County stated that on January 26,

---

[3] Panola County makes much of the fact that Towns admitted to drinking two or three beers and smoking some marijuana before driving. Indeed, beer cans and drug paraphernalia were found in his truck after the accident. However, this is not pertinent to the issue before us and will not be discussed unless comparative fault is at issue.

2015—three months before the washout—an anonymous call from a member of the public was made to the Panola County Road Department to report the need for repair or replacement of the culvert.[4] Deposition testimony from Tommy Austin,[5] the assistant road manager for the Panola County Road Department, revealed that he had visually inspected the culvert on the same day as the call. Austin stated that he went down into the creek bed and "noticed [the culvert pipe] was getting pretty rusty," there was flaking and rusting on the bottom and up the sides of the pipe, and it contained pitting (i.e., small holes formed by rust) in the metal. In his deposition, he also stated that he saw no evidence that day of the ends of the culvert caving in, holes around the culvert, or any dips in the road where the roadbed had begun to sag from extreme culvert deterioration. Despite his description of the culvert pipe's pitting and "rusting and flaking" from the bottom and up the sides, Austin testified that he believed the pipe openings, road, and dirt around the culvert were in good shape. Despite giving this testimony during his deposition, Austin had immediately recommended to Panola County that the culvert be replaced based on his inspection that day because "it was getting pretty rusty." Panola County ordered the culvert to be replaced the day of Austin's inspection.

¶5. Austin's review of the bill of lading for the new culvert pipe established that the pipe was delivered and positioned adjacent to the old culvert on February 4, 2015, where it

---

[4] In his deposition, Tommy Austin with the Panola County Road Department said that he was the person who called in the repair request that day, yet Panola County's interrogatory response stated that an unknown caller first informed them that the culvert needed repair or replacement.

[5] Although Austin was supposed to testify at trial, he was unavailable due to illness. His deposition was read into the record in lieu of trial testimony.

4

remained for the next two months and twenty-one days awaiting installation. Panola County pointed to the weather as the reason the culvert was not replaced in a timely fashion. However, climatological reports from Panola County that Towns provided showed that on forty of the eighty-three days between February 2015 and the night of the accident, no rain was recorded in the area. An additional eight days recorded less than a tenth of an inch of rain, according to Towns. Austin indicated in his deposition that it was possible for the old culvert to be removed and the new one to be installed in one day. Indeed, Panola County's interrogatories indicate that the culvert was replaced on April 29, 2015, four days after Towns' accident.

### B. Kelly Morris

¶6. Testimony during the bench trial presented further confirmation of the culvert's deterioration. Towns first called Kelly Morris, a supervisor in Panola County responsible for inspecting Mount Olivet Road, who testified that the overall condition of the road was listed on his annual reports as either "poor" or "fair" between 2013 and 2015. He then testified that he did not, however, notice any problems with this particular culvert or see any dips in the road that would indicate severe deterioration of the culvert. But Morris, impeached by his deposition during his trial testimony, later refuted this assessment that he never noticed any deterioration around the culvert. Morris had originally testified in his deposition that the ditch was eroding on the outlet end and that it had eroded so badly that it caused a telephone post to fall into the ditch. He had also testified that Panola County repaired this erosion by

putting down riprap[6] around the culvert's outlet end. When confronted with this prior testimony at trial, Morris indicated that the deposition from 2017 was correct. Although Morris could not recall the date that repairs were made to the culvert, he acknowledged it would have been during his tenure as supervisor, which lasted from 2008 to 2016.

¶7. Morris also testified about the Board of Supervisors' annual legal obligation to inspect the conditions. *See* Miss. Code Ann. § 65-7-117 (Rev. 2012).[7] Morris described how he complied with the statutory requirements when he would inspect Panola County roads while riding over them in his vehicle to "visually look for issues." He would not leave his vehicle to inspect the culvert. Later testimony by the road manager for the Panola County Road Department, Lygunnah Bean, indicated that Morris drove too fast to get out of his car to do any visual inspection of the culverts, and Bean further said that the Panola County Road Department "didn't have any sort of regular system in place to send people out to inspect the culvert[s]."

        C.    *Lygunnah Bean*

¶8. Bean testified at length regarding the deterioration of the culvert. He reaffirmed

---

[6] "Riprap" means "[p]iled broken stones used as a foundation or to stabilize an easily eroded bank or slope" or "[a]n assemblage of such broken stones." *Riprap*, The American Heritage Dictionary of the English Language (5th ed. 2011), https://ahdictionary.com/word/search.html?q=rip+rap.

[7] The text of the applicable statute follows: "Each member of the board of supervisors shall inspect every road, bridge and ferry in each district at least annually, at times to be fixed by the board, and shall file with the clerk of the board a report, under oath, of the condition of the several roads, bridges and ferries inspected by him, with such recommendations as are needful, which reports shall be presented to the board of supervisors and kept on file for three (3) years." Miss. Code Ann. § 65-7-117.

Morris' testimony that a dip in the road over a culvert indicated culvert deterioration which represented a dangerous condition; a dip in the road meant dirt under the roadway was "sucking out" from the culvert, and the culvert "could go at any time." He further testified that there was indeed a dip in the pavement over this particular culvert and that Panola County had paved over it to bring the road back up to level. He could not remember exactly when this repair took place and could only say it was during Morris' term as supervisor. Panola County did not provide documentation of this paving repair in the records they provided during discovery. Bean did not recollect a telephone-pole erosion repair Morris testified about, and likewise, the telephone-pole repair was not listed in the records or responses that Panola County provided to Towns during discovery.

### D. Charles Dutill

¶9. The next person to testify in behalf of Towns was a civil and environmental engineer and hydrology expert named Charles Dutill. Like Bean, Dutill testified regarding the dangerous condition presented by a dip in the road over a culvert. He noted that if the soil under the road surrounding the culvert dropped to the point that a dip could be felt in the road, then the culvert pipe was "approaching failure mode and should have been remediated at a substantial period of time prior to that." He also testified, by looking at pictures of the culvert pipe taken after it washed out, that the pipe showed "substantial rust" and flaking and pitting. He opined that "the pipe was in a severely compromised condition." He pointed out in the photos taken after the accident that the bottom of the round culvert pipe, which was positioned upside down in the photo and could be easily viewed, had "deteriorated to the

7

point where there was essentially . . . no metal." Dutill testified that "having no metal for a significant area within the bottom" of the culvert pipe "severely comprises the structural integrity of the pipe to the degree that it is . . . a completely unsafe condition for the pipe, given that [it] is underneath a county road." Finally, Dutill testified regarding Google photos taken in 2009 and 2014 that were admitted into evidence. He described the photos as showing "significant erosion" around at least one end of the culvert. Dutill's testimony was not cross-examined or challenged by a defense expert.[8] Dutill concluded,

> If the pipe itself [was] in generally good condition, and the soil around the pipe was in appropriate condition, it is my opinion that . . . there is an infinitesimal[ly] small likelihood that the storm would have resulted in catastrophic failure. Culverts can be overwhelmed by a storm in terms of it can't carry the capacity such that the area flows. Culverts don't fail catastrophically just with a huge storm.

### E. Danny Towns

¶10. Finally, Towns himself testified to witnessing "the bank . . . washing off around the culvert pipe," as Mount Olivet Road was one that he had traveled on for many years. He testified that he noticed Panola County had been adding concrete and dirt to the edge of the road for five to seven years "to keep from washing off the road." Again, documentation of these repairs was not included in the records or responses from Panola County during discovery.

## II. Testimony Regarding Weather Conditions

### A. Presence of a Tree that Contributed to the Washout

¶11. During Towns' case-in-chief there was testimony about a downed tree in the culvert.

---

[8] Dutill's testimony was taken by deposition, which Panola County did not attend.

This line of questioning was based on Austin's theory he mentioned in his deposition that "in them floods like that, the whole hollow will fill up with water and trees and stuff coming down through there. I figured that's why that pipe washed out. Them trees will come down through there and get sideways in front of that pipe." Austin did not, however, witness the scene that night, and in his deposition he could only provide descriptions of the scene passed on to him by others. Bean was the only person who testified that he *thought* he saw a tree "in the ditch where the culvert was washed out on it, the outlet part end." He admitted that he could not say whether the tree contributed to the culvert's washout; he could only speculate. A video of the ravine after daybreak, taken hours after the vehicles had been cleared, showed that no tree was present at that time. Accompanying testimony established that there was no tree in the culvert that morning.

### B. Chris Downs

¶12. Panola County's first witness was Chris Downs, an employee in geographic information systems operations for Panola County Emergency Operations. Downs testified that when a storm produced significantly heavy rainfall, part of his duties was to go out after the storm died down to look for problems the storm may have caused. He explained that he may look for downed trees, cars in ditches, flooded roads, or washed-out culverts. He was called to the scene of the washed-out culvert by a dispatcher who had received a report of the accident. Downs appears to have been one of the first officials or Panola County employees to the scene. He stated that after his assessment of the scene he "called for technical rescue." Downs described what he witnessed at the scene, such as Harris being pronounced dead and

9

the removal of the truck, as well as Towns' disoriented behavior.

¶13.    Downs next testified to the other damage caused by the storm on the night in question. He described approximately five additional culverts that had washed out, as well as a landslide he traveled to after he left the scene of Towns' accident. Downs explained that at each scene he made a geospatial record of the area, tagged its latitude and longitude, took photos of the damage, and added any notes he could regarding the scene. This information was submitted to State Emergency Management, which kept the data on a server that could generate a map of the county with the damaged areas marked.

¶14.    Panola County entered into evidence a map with the damaged areas marked, over objections based on relevance and hearsay. Towns argued that the map was not relevant because the other damage did not pertain to this particular washout. He further objected that because the map was based on the State's software, using such a map amounted to hearsay. The trial court, however, overruled his objections and found that the map fell within the business-record exception to hearsay.

### C.    *Daniel Cole*

¶15.    Panola County next called Daniel Cole, the director of Panola County Emergency Operations. Cole was also allowed to testify about other damage in Panola County caused by the heavy rainstorm, over Towns' objections based on relevance. Cole testified that as a result of the storm that night, trees were blown down, some roads and railroads were damaged, and some mudslides occurred in Panola County. He further testified that a large sinkhole occurred on Highway 6 in Lafayette County as a result of the storm. Although Cole

stated he could not tell exactly how much rain had fallen that day, he acknowledged weather records from nearby Batesville, Mississippi, measured 3.73 inches of rain for April 25, 2015.

### III.    Trial Court Ruling

¶16.    The trial court issued its ruling on the final day of the bench trial after denying Panola County's motion to dismiss at the close of Towns' case and after hearing the remainder of the witness testimony by defense witnesses.  The trial court found that after reviewing all testimony and exhibits, there was a major weather event on the night in question.  The court, leaning heavily on Austin's deposition, also found that there was no dip in the road that would indicate severe culvert deterioration.  Furthermore, the court found it was "more probable than not that the tree or the heavy rain caused the washout" based on Bean's testimony that he thought he saw a tree in the culvert after the accident.  The court found that these circumstances allowed Panola County to fall under the weather immunity of section 11-46-9(1)(q).  Additionally, the trial court found Panola County immune under 11-46-9(1)(v), the premises immunity, because the County did not have notice of the dangerous condition of the washout itself.  Because the trial court found that Panola County was immune on these two grounds, the court did not make a finding under the discretionary-function immunity in section 11-46-9(1)(d).  The trial court issued its findings of fact in the following month (November 2020).  Towns filed his notice of appeal immediately thereafter.

### STANDARD OF REVIEW

¶17.    The standard of review for a judgment following a bench trial is well settled: "A circuit court judge sitting without a jury is accorded the same deference with regard to his

11

findings as a chancellor, and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence." *City of Jackson v. Internal Engine Parts Grp. Inc.* 903 So. 2d 60, 63 (¶7) (Miss. 2005) (quoting *City of Jackson v. Perry*, 764 So. 2d 373, 376 (¶9) (Miss. 2000)). "This Court leaves undisturbed a circuit court's findings following a bench trial unless the findings 'are manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.'" *Miss. Dep't of Wildlife, Fisheries & Parks v. Webb*, 248 So. 3d 772, 776 (¶4) (Miss. 2018) (quoting *City of Jackson v. Sandifer*, 107 So. 3d 978, 983 (¶16) (Miss. 2013)). "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *UHS-Qualicare Inc. v. Gulf Coast Cmty. Hosp. Inc.*, 525 So. 2d 746, 754 (Miss. 1987). If the record on appeal shows that a resolution of fact "is based on a mere scintilla of evidence . . . and is against [the] overwhelming weight of the credible evidence[,] the Court will not hesitate to reverse." *Johnson v. Ferguson*, 435 So. 2d 1191, 1194-95 (Miss. 1983) (citing *Universal Mfg. Co. v. Barlow*, 260 So. 2d 827, 831 (Miss. 1972)).

¶18.     "Questions of law, which include the proper allocation of the Mississippi Tort Claims Act, are reviewed de novo." *Internal Engine Parts Grp.*, 903 So. 2d at 63 (¶7) (citing *Maldonado v. Kelly*, 768 So. 2d 906, 908 (¶4) (Miss. 2000)). Immunity is also a question of law. *Smith v. Pike County*, 312 So. 3d 731, 734 (¶9) (Miss. Ct. App. 2021). Specifically "[t]he standard of review for a trial court's determination that a governmental entity is immune under the MTCA is de novo." *Smith ex rel. Smith v. Leake Cnty. Sch. Dist.*, 195 So.

3d 771, 774 (¶8) (Miss. 2016).

¶19.    Finally, the standard of review of a trial court's admission or exclusion of evidence is abuse of discretion. *Ladnier v. State*, 878 So. 2d 926, 933 (¶27) (Miss. 2004). Reversal is proper only when "the error adversely affects a substantial right of a party." *Id*.

## DISCUSSION

### I.    Weather Immunity under the MTCA

¶20.    This case was brought under the MTCA, which " provides the exclusive civil remedy against a governmental entity or its employee for acts or omissions which give rise to a suit." *Horton ex rel. Est. of Erves v. City of Vicksburg*, 268 So. 3d 504, 508 (¶13) (Miss. 2018) (citing *Stewart ex rel. Womack v. City of Jackson*, 804 So. 2d 1041, 1046 (¶9) (Miss. 2002)). Mississippi Code Annotated section 11-46-9 provides exemptions from liability. If the claim falls under one of the designated immunities, no governmental-entity liability can be found. *Id*. Towns asserts that the trial court erred when it found Panola County had immunity under the MTCA based on weather immunity under section 11-46-9(1)(q). We agree and reverse. Panola County is not entitled to immunity under this defense because the trial court clearly erred in finding that the weather was the sole cause of Towns' injuries.

¶21.    The weather-immunity provision provides that "[a] governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim . . . [a]rising out of an injury caused *solely* by the effect of weather conditions on the use of streets and highways[.]" Miss. Code Ann. § 11-46-9(1)(q) (emphasis added). This exemption only applies if the weather is the *sole cause* of the injury

13

in question. *See Willing v. Est. of Benz*, 958 So. 2d 1240, 1253 (¶36) (Miss. Ct. App. 2007).

¶22.    In *Ostrowski v. City of D'Iberville*, 269 So. 3d 418 (Miss. Ct. App. 2018), a plaintiff wrecked after hitting an uncovered manhole during a heavy storm. *Id.* at 419 (¶2). Ostrowski sued the city for its negligent planning of the sewer system, asserting that the city knew the system contained deficiencies that caused it to flood and displace the manhole covers. *Id*. at (¶3). In that case, this Court affirmed summary judgment because Ostrowski failed to put forth evidence to show that the sewer system actually contained deficiencies or that the city knew or should have known about the issue. *Id*. at 421 (¶12).

¶23.    These facts are distinguishable from the present case. Here we have every testifying employee of Panola County who had knowledge of the culvert mention a different type of deterioration to the culvert. Austin testified to the presence of pitting, rusting, and flaking when he visually inspected the culvert. Morris testified to the erosion of a telephone pole into the culvert and repairs made afterward. And Bean testified to repairs made to a dip over the culvert, a sign of near failure according to Towns' expert Dutill's testimony. Panola County knew of this deterioration and had scheduled the repair approximately three months before the accident occurred.

¶24.    In *Smith v. Pike County*, 312 So. 3d 731 (Miss. Ct. App. 2021), a factually similar case to the present one, a plaintiff sued Pike County after she drove her car into a washed-out culvert that Pike County had placed no warning signs around, although the road had washed out, and Pike County was notified approximately thirty-six hours before. *Id*. at 736 (¶17). Although this Court upheld summary judgment in favor of Pike County under weather

14

immunity, this case is distinguishable, because Smith did not allege that Pike County failed to properly maintain the roadway. *Id*. at 737 (¶24) (Westbrooks J., concurring). Similarly, in *Willing* "[b]ecause the [plaintiffs] do not point to any evidence that [the defendants] contributed to or were otherwise responsible . . . , summary judgment was appropriate as to this immunity." *Willing*, 958 So. 2d at 1254 (¶39). This is not so in Towns' case, as he indicates from his complaint onward.

¶25. In the present case, upon review of the record, no substantial credible evidence supports a finding that the weather event on the night of April 25, 2015, was the *sole* cause of the culvert washout. As discussed previously, every witness with knowledge of the culvert testified of the deteriorated condition of the culvert or repairs to it. Witnesses also testified that the new culvert pipe lay next to the old culvert for approximately three months without being installed, although Austin indicated a pipe could sometimes be installed in one day.

¶26. It is well settled that "[t]here may be more than one proximate cause of an injury[.]" *Hill v. Columbus Ice Cream & Creamery Co.*, 230 Miss. 634, 642, 93 So. 2d 634, 636 (1957) (quoting *Am. Creosote Works of La. v. Harp*, 215 Miss. 5, 12, 60 So. 2d 514, 517 (1952)). A defendant's negligence is considered a proximate cause of a plaintiff's injury if it was a "substantial factor in producing the injury" even if it was "not . . . the sole cause of [the] injury." *T.L. Wallace Constr. Inc. v. McArthur, Thames, Slay & Dews PLLC*, 234 So. 3d 312, 330 (¶68) (Miss. 2017) (quoting *Travelers Cas. & Sur. Co. of Am. v. Ernst & Young LLP*, 542 F.3d 475, 485 (5th Cir. 2008)). While it is possible the washout in the present case might not have occurred but for the heavy rain, the record reflects that it also would not have

15

washed out but for the culvert's deterioration and but for the negligence of Panola County in adequately inspecting and maintaining the culvert. As Dutill opined, culverts do not just catastrophically fail due to heavy rainstorms. And as this Court recognizes, heavy rainstorms occur each year without massive culvert failures afterward. The record evidence of the culvert's deterioration and Panola County's neglect in inspecting and repairing the culvert as contributing factors to the washout means that the washout was not "solely" caused by the heavy rains that night as the statute requires.

¶27. Furthermore, there is no substantial credible evidence to indicate that a tree downed by the heavy rains was the cause of the washout as the trial court found. The trial court based this finding on Austin's assumption during his deposition that downed trees can "get sideways in front of the pipe," which is why he "figured that's why that pipe washed out," and on Bean's speculative testimony that he thought he saw a tree at the outlet end of the culvert. Austin did not testify to seeing any proof of his theory. And no evidence was presented that the tree Bean may have seen either blocked the culvert or in any way contributed to the culvert's failure. Bean admitted that he was not present at the time the culvert washed out and that the idea the tree contributed to the washout was "complete speculation."

¶28. To conclude, the record reflects that the culvert was deteriorated and that Panola County was well aware of that fact. Furthermore, there is no substantial credible evidence that the weather alone or a tree downed by the weather caused the washout of the culvert. As such, it was clearly error for the trial court to find that Panola County was entitled to

16

immunity based upon section 11-46-9(1)(q), weather immunity.

## II.  Premises Immunity under the MTCA

¶29.  Towns also asserts that the circuit court erred when it found Panola County was immune under the MTCA based on premises immunity. Miss. Code Ann. § 11-46-9(1)(v). We agree and reverse because it was clearly erroneous for the trial court to conclude that this immunity applied to Panola County.

¶30.  The premises-immunity provision of the MTCA specifies:

> A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim: . . . (v) Arising out of an injury caused by a dangerous condition on property of the governmental entity *that was not caused by the negligent or other wrongful conduct of an employee of the governmental entity* or of which the governmental entity did not have notice, either actual or constructive, and adequate opportunity to protect or warn against; provided, however, that a governmental entity shall not be liable for the failure to warn of a dangerous condition which is obvious to one exercising due care[.]

*Id*. § 11-46-9(1)(v) (emphasis added). A dangerous condition has been broadly defined in our state as "any condition that should be corrected by the governmental unit [] and which . . . endangers the public." Jim Fraiser, *A Review of the Substantive Provisions of the Mississippi Governmental Immunity Act: Employees' Individual Liability, Exemptions to Waiver of Immunity, Non-Jury Trial, and Limitation of Liability*, 68 Miss. L.J. 703, 828 (1999).

¶31.  In *Calonkey v. Amory School District*, 163 So. 3d 940 (Miss. Ct. App. 2014), this Court explained:

> Subsection (v) has two provisions. Primarily, subsection (v) shields the government from any claim based on a dangerous condition *when the*

17

> *condition was not due to the negligent or willful actions of a government employee* or when the government did not know about the condition so as to be able to remedy it or warn about it. Miss. Code Ann. § 11-46-9(1)(v). Additionally, subsection (v) prevents government liability for a failure-to-warn claim when the dangerous condition is "obvious to one exercising due care."

*Id*. at 943 (¶13) (emphasis added). We further explained that "[section11-46-9(1)(v)] does not exempt the District from liability for causing the dangerous condition through the negligent or willful actions of its employees." *Id*. at (¶14) (citing *City of Natchez v. Jackson*, 941 So. 2d 865, 876 (¶33) (Miss. Ct. App. 2006)).

¶32. While the trial court correctly ascertained that Panola County had no notice of the washout itself, it is uncontested here that the government knew of the culvert's deterioration and failed to timely repair it. This is especially true in light of the fact that repairs to the culvert had been scheduled for approximately three months prior to Towns' accident. Panola County argues that the dangerous condition was the washout that occurred on April 25, 2015, not the culvert's deterioration itself, but we find that this argument is unpersuasive. In *Internal Engine Parts Group Inc.*, the City of Jackson had actual notice via phone calls reporting a debris-filled drainage ditch but did not clean it out, leading to a flash flood during a heavy rainstorm that severely damaged a local business. *Internal Engine Parts Grp.*, 903 So. 2d at 62 (¶¶3-4). While the City of Jackson argued that the dangerous condition was the flash flood, the Supreme Court found that "[t]he City of Jackson, by its negligent failure to inspect and maintain the drainage ditch, created a separate dangerous condition; i.e. an obstructed drainage ditch through which water could not properly flow, which proximately caused or contributed to the flooding of Engine Parts' building." *Id*. at 64 (¶10).

18

Furthermore, the Supreme Court found that "[t]here was substantial credible evidence to support the trial court's finding that the City had either actual or constructive notice of the debris obstructions." *Id*.

¶33.    Just like in *Internal Engine Parts Group*, Panola County, by its negligent failure to inspect, maintain, and timely repair its culvert, "created a separate dangerous condition which proximately caused or contributed to" the collapse of the culvert and Towns' injuries.  In the present case the record shows Panola County had actual knowledge of the deteriorated culvert pipe and failed to timely repair it.  Annual inspections were made from a truck going "too fast" for the supervisor to conduct a visual inspection of the culverts, and the Panola County Road Department "didn't have any sort of regular system in place to send people out to inspect the culvert[s]."  Even so, there was a phone call reporting the deterioration in January, testimony from multiple Panola County employees regarding observation of the deterioration to the culvert and subsequent repairs over the years, as well as a three-month standing repair order from Panola County.  Furthermore, the new culvert pipe lay on the side of the road for two months and twenty-one days awaiting installation.  Panola County not only had adequate notice of the deterioration of the culvert, but they also had adequate time to repair it, as evidenced by the testimony from Austin that culvert repairs can sometimes take one day, as well as the four-day repair after Towns' accident.

¶34.    Because everyone who testified noted the culvert's observable deterioration, and additional testimony showed Panola County's failure to repair it in a timely fashion, there existed a separate, earlier dangerous condition than the one created by the washout itself.

19

The record shows that Panola County had adequate notice of the earlier dangerous condition prior to the night of the culvert's failure and washout, and Panola County neglected to remedy it. For the trial court to find that the washout was the dangerous condition without finding that Panola County, by its negligent failure to inspect and maintain the drainage ditch, created a separate dangerous condition was not supported by substantial credible evidence. An entity is not entitled to immunity under premises immunity of section 11-46-9(1)(v) when the condition is due to the negligent or willful actions of that entity. *See* Miss. Code Ann. § 11-46-9(1)(v); *Calonkey*, 163 So. 3d at 943 (¶14). Given this law and these facts, we find that the trial court clearly erred in finding Panola County was entitled to immunity under section 11-46-9(1)(v).

## CONCLUSION

¶35. For the foregoing reasons, we reverse the trial court's order finding Panola County immune under the MTCA's provisions regarding weather immunity, § 11-46-9(1)(q), and premises immunity, § 11-46-9(1)(v). Thus, we reverse the trial court's judgment and remand the case for further proceedings consistent with this opinion.

¶36. **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. EMFINGER, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**